1   Aram Ordubegian (SBN 185142)
    Annie Y. Stoops (SBN 286325)
2   Sophia R. Wang (SBN 324494)
    **ARENTFOX SCHIFF LLP**
3   555 West Fifth Street, 48th Floor
    Los Angeles, CA  90013-1065
4   Telephone:    213.629.7400
    Facsimile:    213.629.7401
5   aram.ordubegian@afslaw.com
    annie.stoops@afslaw.com
6   sophia.wang@afslaw.com

7   Jackson D. Toof *(admitted pro hac vice)*
    **ARENTFOX SCHIFF LLP**
8   1717 K Street, NW
    Washington, DC  20006-5342
9   Telephone:    213.629.7400
    Facsimile:    213.629.7401
10  jackson.toof@afslaw.com

11  Special Litigation Counsel for Richard A.
    Marshack, Plaintiff and Chapter 7 Trustee
12

13              **UNITED STATES BANKRUPTCY COURT**

14      **CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION**

15

16  In re                                    Case No. 8:21-bk-11886-SC

17  **HAAH AUTOMOTIVE HOLDINGS**            Chapter 7
    **INC.,**
18
                    Debtor,
19

20  **RICHARD A. MARSHACK**, solely in his    Adv. Case No. _____
    capacity as Chapter 7 Trustee of the
21  substantive consolidated bankruptcy estates
    of HAAH Automotive Holdings Inc.,         **COMPLAINT FOR:**
22  HAAH Motors Holdings, Inc., and Zotye
    USA LLC,                                  **(1) AVOIDANCE OF CONSTRUCTIVELY**
23                                                **FRAUDULENT TRANSFERS [11 U.S.C.**
                    Plaintiff,                    **§ 548(a)(1)(B), and 550];**
24      vs.                                   **(2) AVOIDANCE OF CONSTRUCTIVELY**
                                                  **FRAUDULENT TRANSFERS [11 U.S.C.**
25  **CHERY AUTOMOBILE CO., LTD.**, a             **§§ 544(b), and 550, and Cal. Civ. Code §§**
    Chinese company, and, **SHANGHAI**           **3439.04(a)(2), 3439.05, and 3439.07];**
26  **SICAR AUTOMOBILE TECHNOLOGY**          **(3) FRAUDULENT CONCEALMENT;**
    **DEVELOPMENT CO., LTD.**, a Chinese     **(4) RECOVERY AND PRESERVATION**
27  company,                                      **OF AVOIDED TRANSFERS [11 U.S.C.**
                    Defendants.                   **§§ 550 and 551];**
28

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

**(5) ACCOUNTING [11 U.S.C. § 542]; and**
**(6) TURNOVER [11 U.S.C. § 542]**

Richard A. Marshack, the duly appointed chapter 7 trustee (the "Trustee" or the "Plaintiff") for the substantively consolidated bankruptcy estate (the "Estate") of debtors HAAH Automotive Holdings Inc. ("HAAH Auto" or the "Debtor"), HAAH Motors Holdings, Inc. ("HAAH Motors"), and Zotye USA LLC ("Zotye USA," collectively with HAAH Auto and HAAH Motors, the "Debtors"), hereby files this complaint to, among other things, avoid and recover a constructive fraudulent transfer of at least $13.7 million USD that the Debtors transferred to Chery Automobile Co., Ltd. ("Chery") and its subsidiary Shanghai Sicar Automobile Technology Development Co., Ltd. ("Sicar," and together with Chery, the "Chery Parties").  In support thereof, the Trustee alleges as follows:

**I.**

**THE PARTIES**

1.      The Trustee brings this action solely in his capacity as the Chapter 7 Trustee of the substantively consolidated bankruptcy estate of the Debtors.

2.      HAAH Automotive Holdings Inc. is the debtor in this Bankruptcy Case, and is a corporation incorporated under the laws of the state of Delaware.  The Debtor was the parent company and 100% owner of HAAH Motors and Zotye USA.

3.      HAAH Motors Holdings, Inc. is a corporation incorporated under the laws of the state of Delaware.  On information and belief, the Debtor formed HAAH Motors to be the party to the agreements with the Chery Parties, and it would have been the operating entity had the deal moved forward.

4.      Zotye USA LLC is a limited liability company formed under the laws of the state of Delaware.  On information and belief, in 2019 the Debtor formed Zotye USA, which was the predecessor of HAAH Auto with respect to the distribution and service agreement executed by the Debtor and another Chinese automobile manufacturer, Chinese private-owned automobile manufacturer, Zotye International Automobile Trading Co., Ltd.

5.      Chery Automobile Co., Ltd. is a Chinese state-owned automobile manufacturer and the parent company of Sicar.

6.      Shanghai Sicar Automobile Technology Development Co., Ltd. is a Chinese automobile manufacturer and a subsidiary of Chery.

## II.

## JURISDICTION AND VENUE

7.      This adversary proceeding arises in and relates to the chapter 7 case *In re HAAH Automotive Holdings Inc*., which is pending before the United States Bankruptcy Court for the Central District of California (the "Court"), Case No. 8:21-bk-11886-SC (the "Bankruptcy Case").

8.      This adversary proceeding is commenced pursuant to Rule 7001, *et seq.* of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); 11 U.S.C. §§ 542, 548, and 551.

9.      This Court has original jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b) because it arises under the Bankruptcy Code and arise in and relates to cases under the Bankruptcy Code.  This adversary proceeding is a "core" proceeding under 28 U.S.C. §§ 157(b)(2)(A), (E), and (H), and the Court can and should enter final orders for matters contained therein.

10.      The Trustee confirms his consent to the entry of a final order or judgment by the Court in connection with this adversary proceeding to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

11.      Venue is proper in this district pursuant to 28 U.S.C. § 1409(a), in that the instant proceeding is related to the Bankruptcy Case.

## III.

## SUMMARY OF ACTION

12.      This action arises from the Chery Parties' fraudulent conduct, which caused the Debtors' release of approximately $13.7 million USD (the "Funds") to Sicar.  Specifically, the Chery Parties knew that they had significant intellectual property issues preventing the Chery Parties from performing under the ESA (defined below).  The Chery Parties intentionally and

knowingly concealed such intellectual property problems from the Debtors while they requested that the Debtors release the Funds to Sicar. The Debtors would not have agreed to release the Funds had the Chery Parties informed the Debtors of the intellectual property problems at the time of the Chery Parties' request.

13. HAAH Motors and Sicar entered into an Engineering Services Agreement, dated October 12, 2019 (the "ESA"), pursuant to which HAAH Motors agreed to pay Sicar for, *inter alia*, engineering services necessary to bring certain Chinese vehicles to market in the United States.

14. HAAH Motors and Sicar were the only parties to the ESA.

15. Pursuant to the ESA, in February 2020, the Debtors advanced to Sicar at least $17 million USD which were subject to the authorization of the Debtors for Sicar's use for performing the engineering services.

16. By June 2020, Sicar had never provided any evidence to the Debtors as to its progress with the engineering services or an explanation of what costs and expenses Sicar incurred in performing any engineering services pursuant to the ESA.

17. On information and belief, in or around June 2020, HAAH Motors and the Chery Parties agreed to change the deal structure and started negotiating a joint venture (the "JV") to act as the North American business unit of the Chery Parties and HAAH Motors that would serve to bring the modified and re-branded vehicle models for sale in the United States and Canada markets.

18. On information and belief, as HAAH Motors and Chery Parties were involved in negotiating the JV, they also understood that the terms of, and the parties' responsibilities under, the ESA had changed and were changing as they continued to discuss additional terms in the JV.

19. On information and belief, the Chery Parties did not negotiate the JV in good faith, and instead took hardline and unreasonable stances that they should not be responsible for product liability claims or warranty claims, even though the standard custom in the automotive industry is for the automotive manufacturer, the Chery Parties, to be responsible for product liability claims or warranty claims.

20. In March 2021, Sicar sought HAAH Motors' authorization to release the remaining $13.7 million (i.e., the Funds) in advanced funds from the Debtors under the ESA under re-

negotiation. On information and belief, the Chery Parties stalled and effectively stopped JV negotiations with their bad-faith demands as a pressure tactic to coerce the Debtors into agreeing to release the Funds even though the parties were re-negotiating the terms of the ESA in connection with the JV negotiations.

21.     On the other hand, by March 2021, Sicar had never provided any evidence to the Debtors that it performed any engineering services or an explanation of what costs and expenses Sicar incurred in performing any engineering services pursuant to the ESA.

22.     On information and belief, the Debtors were misled by the Chery Parties into believing that the release of the Funds was essential for the Chery Parties to restart JV negotiations; such that, on April 13, 2021, the Debtors agreed to the release of the Funds for Sicar's use for the engineering services.

23.     However, soon after the Debtors' release of the Funds, the Chery Parties revealed that there were 49 intellectual property ("IP") issues, including two "high risk" IP issues that would require engineering changes to the design of the vehicle models or finding another supplier.  Many of these issues should have been known to the Chery Parties when they first began the engineering services and thus should have been relayed to the Debtors much earlier, but were intentionally concealed by the Chery Parties and only revealed to the Debtors *after* the Debtors agreed to the release of the Funds for Sicar's use.

24.     Had the Debtors known of these issues before—and the fact that they would make it impossible for Sicar to perform the engineering services on a reasonable timeline—the Debtors would never have authorized the release of the Funds.

25.     Moreover, the Chery Parties continued to ignore the industry custom and insisted on their unreasonable demands to purposefully stall the joint venture negotiations.

26.     The Debtors were left with no choice but to terminate the ESA in June 2021.

27.     The failure of the deal with the Chery Parties also meant that the Debtor's business was no longer viable, as it had been relying on the deals with the Chery Parties. The Debtor filed this chapter 7 case on July 30, 2021.

**IV.**

**GENERAL ALLEGATIONS**

**A.**   **Background.**

28.    On July 30, 2021 (the "Petition Date"), the Debtor filed a voluntary chapter 7 petition, initiating the Bankruptcy Case.  Also on July 30, 2021, the Court appointed Richard A. Marshack as the chapter 7 trustee.  See Dkt. No. 1.

29.    The Debtor's Schedules and Amended Schedules [Dkt. Nos. 1 and 10] list approximately $82,000 USD in assets and $44.97 million USD in liabilities.

30.    The Debtor was incorporated in September 2016 and was intended to be the American distributor for foreign manufactured vehicles.

31.    The Debtor's management included its CEO Duke Hale ("Hale"), former president Michael Davis ("Davis"), executive vice president of sales operations Bob Pradzinski ("Pradzinski"), and CFO/Controller Jim Mulvaney ("Mulvaney").  The Debtor also had several affiliates, including HAAH Motors and Zotye USA.

32.    Hale was and is also HAAH Motors's CEO and Chairman.

**B.**   **HAAH Motors and Sicar Entered into the Engineering Service Agreement.**

33.    In October 2019, the Debtor and its affiliate, HAAH Motors, entered into a series of agreements with the Chery Parties, chief of which was the ESA,[1] pursuant to which Sicar was to perform engineering and homologation services on Chery-manufactured Exeed brand vehicle models and parts for distribution and sale in United States and Canada by HAAH Motors.

34.    Pursuant to the ESA, the specific engineering services Sicar was to perform were listed in Schedule 2 of the ESA,[2] and included, among other things, legal homologation, Apple CarPlay, and towing capability of 2,500 pounds.  The services were placed into three "buckets:" Bucket 1 included legal homologation and all activities to make the vehicles legally salable; Bucket 2 included activities to develop and validate content to meet basic customer expectations for an

---

[1] A true and correct copy of the ESA produced by the Debtor to the Trustee is attached hereto as **Exhibit 1**.

[2] A true and correct copy of Schedules 2-4 produced by the Debtor to the Trustee, as completed later, is attached hereto as **Exhibit 2**.

SUV in the United States; and <u>Bucket 3</u> (later clarified to be not included in the engineering services) included activities required to develop and validate content to make the vehicles competitive for sale in the United States.

35.    The milestones and payment plan versus deliverables were listed in Schedule 4 of the ESA, which included a detailed list of specific engineering services that were to be performed in connection with payment.

36.    Section 3.7 of the ESA provided that "Sicar shall provide its books and records with respect to the costs and expenses incurred by Sicar (and its Affiliates) and comprising the Engineering Service Fees and such other evidence of the same as HAAH may reasonable request."

37.    On information and belief, because HAAH Motors had minimal revenue, in order to pay to the Chery Parties under the ESA, on January 23, 2020, the Debtors (HAAH Auto, HAAH Motors, and Zotye USA) on the one hand, and Bank7, an Oklahoma banking corporation, on the other hand, executed a loan and security agreement and promissory note, pursuant to which Bank7 was to loan the Debtors up to $24.675 million USD.[3]

38.    On information and belief, in February 2020, the Debtors had advanced to Sicar at least $17 million USD including the Funds which were subject to the authorization of the Debtors for Sicar's use for performing the engineering services.

39.    On information and belief, due to the Debtor's lack of revenue, the Debtor's future success was almost entirely dependent on the success of the deal with the Chery Parties pursuant to the ESA.

40.    By June 2020, Sicar had never provided any evidence to the Debtors as to its progress with the engineering services or an explanation of what costs and expenses Sicar incurred in performing any engineering services pursuant to the ESA.

**C.    <u>The Chery Parties Negotiated a Joint Venture with the Debtors in Bad Faith.</u>**

41.    On information and belief, in or around June 2020, the Chery Parties began negotiations with the Debtors for formation of the JV between Sicar and HAAH Motors, and the

---

[3] Bank7 later sold and assigned its right, title, and interest in the loan to Haines Capital Group, LLC, which is now the only substantial secured creditor of the Estate.

Debtors and the Chery Parties agreed to change the deal structure.

42. On information and belief, the JV was to act as the North American business unit of HAAH Auto and the Chery Parties to bring the modified and re-branded Chery vehicle models for sale in the United States and Canada markets.

43. On information and belief, it is standard in the automotive industry, and every other industry, for the manufacturer of the product—here, the Chery Parties—to be responsible for product liability claims.

44. On information and belief, however, one of Sicar's demands was that product liability claims needed to be paid or indemnified solely by HAAH Motors.

45. On information and belief, the Chery Parties also refused to negotiate regarding sharing costs for warranty claims and refused to deviate from their unjustified position that they should have no liability or obligations other than providing the vehicles.

46. On information and belief, the Chery Parties staked out these extreme positions and refused any compromises or alternatives proposed by the Debtors, which derailed negotiations on the JV.

47. On information and belief, in early 2021, progress on the JV formation stalled due to the Chery Parties' intentional disregard of industry custom and insisting on their unreasonable demands during the negotiation.

**D.     The Chery Parties Concealed Their Inability to Perform under the Agreements.**

48. The Chery Parties stalled and undermined the JV negotiations by making unreasonable demands, and at the same time, concealed their inability to perform under the agreements.

49. On information and belief, as the Debtors and Chery Parties were involved in negotiating the JV, the parties agreed and understood that the terms of, and the parties' responsibilities under, the ESA had changed and were changing as they continued to discuss additional terms in the JV.

50. On information and belief, in mid-2020, Sicar was not making progress with the homologation services under the ESA, at which time, the Chery Parties did not inform the Debtors

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

1  that the delay was caused in substantial part to IP issues arising from use of certain vehicle parts

2  that were subject to IP licensed from third parties.

3       51.    On information and belief, the parties purportedly entered into at least four

4  supplemental agreements to the ESA between January and August 2020.[4]  While the first

5  supplemental agreement was not fully executed, it served to note the parties' agreement to the form

6  of Schedules 2 and 4 to the ESA and to include a new Schedule 3 with revised homologation

7  requirements.  The second through fourth supplemental agreements[5] sought to memorialize Sicar's

8  receipt of $17.7 million USD from the Debtors.  In addition, the fourth supplemental agreement

9  provided that Sicar would refund $750,000 USD to HAAH Motors, as well as an acknowledgment

10  that Sicar would not be deemed in breach for the delays in performing the engineering services.

11  Finally, the fourth supplemental agreement provided that the parties would "further discuss and

12  agree on relevant changes to the schedule for the provision of Engineering Services."

13       52.    On information and belief, no evidence or proof was provided to the Debtors

14  showing any progress by Sicar regarding the homologation of the vehicle models, or what costs

15  and expenses had been incurred, as required under Section 3.7 of the ESA.

16       53.    On information and belief, in early 2020 the Chery Parties should have known or

17  already knew of potentially insurmountable issues preventing successful completion of the

18  homologation services.

19       54.    On information and belief, as one example, the Chery Parties used a transmission

20  manufactured by SAIC General Motors Corporation Limited (a joint venture between General

21  Motors Company and SAIC Motor) and could not resolve whether vehicles using a transmission

22  by SAIC General Motors satisfied the homologation requirements for vehicles sold in United States

23  and Canada.

24       55.    On information and belief, as another example, a similar IP issue arose with the

25

26  [4] A partially executed true and correct copy of the first supplemental agreement provided by the Debtor to the Trustee is attached as hereto as **Exhibit 3**.  A fully executed true and correct copy of the second supplemental agreement provide by the Debtor to the Trustee is attached hereto as **Exhibit 4**.  Partially executed true and correct copies of the third and fourth supplemental agreements provided by the Debtor to the Trustee are attached hereto as **Exhibits 5** and **6**.

27

28  [5] The third supplemental agreement terminated the second supplemental agreement.

sunroof—which was a major component of the vehicle around this time—that could not be resolved.

56.     On information and belief, the Chery Parties, instead of informing the Debtors of the IP issues and their inability to make progress with its homologation service, the Chery Parties negotiated with the Debtors for formation of the JV, which misled the Debtors to agree to release the Funds.

**E.    The Chery Parties Concealed 49 IP Issues Until After the Debtors Agreed to Transfer the Funds to Sicar.**

57.     On March 24, 2021, Sicar sent a letter to HAAH Motors (the "Fund Release Letter") that acknowledged receipt of $17,687,105.48 USD from the Debtors and represented that Sicar along with its subcontractors have incurred expenses and costs in an aggregate amount of $3,986,362.34 USD.

58.     On information and belief, at the time that Sicar sent the Fund Release Letter, the parties were operating with the understanding that the original terms of the ESA were in the process of being revised in connection with the parties's JV negotiations.

59.     Nonetheless, in the Fund Release Letter, Sicar sought confirmation that it could use the Funds, *i.e.*, the balance of $13,700,743.14 USD (after deducting expenses) so that it could continue to (purportedly) carry out the engineering services notwithstanding the parties' ongoing discussions regarding the business model, JV, and new engineering schedule.

60.     On information and belief, as acknowledged in the supplemental agreements to the ESA, Sicar was behind schedule in performing the required engineering services under the ESA.

61.     On information and belief, furthermore, Sicar had never provided HAAH Motors with any reports or evidence to attest to and substantiate what services it had performed, what progress had been made in homologating the vehicles, and what specific costs and expenses had been incurred.

62.     The Fund Release Letter further demonstrates that Sicar had not performed all required engineering services, as it acknowledged that less than $4 million USD of the $17.6 million USD transferred by the Debtors had been used up to that point.

63.     Although the Debtors had already advanced the Funds to Sicar, Sicar acknowledged through the Fund Release Letter that HAAH Motors still had the right to control whether the Funds would be used.

64.     On information and belief, the Debtors were dissatisfied with the progress on the JV negotiations and the engineering services.

65.     On information and belief, Sicar made it apparent to Hale and Pradzinski that the release of the Funds was necessary for the Chery Parties to continue the JV negotiations.  Therefore, on information and belief, the Debtors believed that completing the JV would be impossible unless Sicar was permitted to use the Funds for engineering services.

66.     On information and belief, only after being convinced that the release of the Funds was essential for the JV to be completed and Sicar to continue performing the engineering services under the ESA, on April 13, 2021, Hale executed the letter to confirm that Sicar could use the Funds, *i.e.*, the remaining $13,700,743.14 USD (the "Fund Transfer").

67.     On information and belief, although Sicar executed the term sheet for the JV, dated April 14, 2021, the Chery Parties continued to ignore the industry custom and refuse to change their unreasonable stances on, among other things, product liability and the sharing the costs for warranty claims.

68.     On information and belief, not only did the Chery Parties continue to stall the JV negotiations through insisting on unreasonable demands, the month after the Fund Transfer, in May 2021, the Chery Parties informed the Debtors for the first time that there were as many as 49 unresolved IP issues related to the use of third-party IP for certain parts, including the transmission and sunroof previously discussed.  Two IP issues were designated as "high risk" that would require engineering changes to the design of the vehicle models and/or finding another supplier.

69.     On information and belief, the Chery Parties intentionally waited for the Debtors to complete the Fund Transfer of the remaining $13.7 million USD (*i.e.*, the Funds) before revealing the numerous unresolved IP issues, including the two "high risk" issues.

70.     On information and belief, both the volume and severity of the IP issues would have

1   made it impossible for the Chery Parties to deliver the vehicles contemplated in the ESA.

2        71.    On information and belief, many of the IP issues were or should have been known

3   to the Chery Parties at the beginning of the ESA, but were deliberately concealed from the Debtors,

4   even when the Chery Parties knew that performing as contemplated by the parties would not be

5   possible, so that the Debtors would consent to the Fund Transfer.

6        72.    On information and belief, after (a) the Chery Parties made the negotiation of the

7   JV impossible by taking bad-faith and unreasonable positions, and (b) the Chery Parties revealed—

8   with suspicious timing—the 49 IP issues, which made it impossible for the engineering services to

9   be completed, the Debtors decided to terminate the ESA in June 2021.

10        73.    On July 30, 2021, the Debtor filed for chapter 7 relief and commenced this

11   Bankruptcy Case.

12   **F.**    **The Debtor was Insolvent at the Time of the Fund Transfer**

13        74.    According to Debtor's Schedules and Amended Schedules [Dkt. Nos. 1 and 10], the

14   Debtors show over $44 million USD in liabilities against only about $82,000 USD in assets as of

15   the Petition Date (i.e., July 30, 2021).  Thus, under the balance sheet test, the Debtor was or became

16   insolvent.

17        75.    At the time of the Fund Transfer on April 13, 2021, the Debtor either:

18       a.   Was insolvent, or became insolvent as a result thereof;

19
20       b.   Was engaged or was about to engage in a business or a transaction for which
       any property remaining of the Debtor was of unreasonably small capital; or

21       c.   Intended to incur, or believed that it would incur, debts beyond its ability to pay
22          as such debts matured.

23        76.    On information and belief, the Debtor was insolvent, or became insolvent as a result

24   of the Fund Transfer.

25   ///

26   ///

27   ///

28

**V.**

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**

**Avoidance of Constructively Fraudulent Transfer**

**[11 U.S.C. §§ 548(a)(1)(B), and 550]**

77.　　The Trustee realleges and incorporates herein by reference each and every allegation contained in all prior paragraphs of this Complaint.

78.　　The Trustee is entitled to avoid the Fund Transfer pursuant to Bankruptcy Code section 548(a)(1)(B).

79.　　On information and belief, the Debtors received no engineering services, and thus did not receive reasonably equivalent value in exchange for the Fund Transfer.  In fact, the Debtors received virtually no value in return—as the deal failed due to the Chery Parties' failure to disclose the IP issues timely and general bad faith—and the Chery Parties ignored the Debtors' requests for providing records on what engineering services had been performed and what costs and expenses had been incurred.

80.　　At the time of the Fund Transfer, the Debtor either:

    d.　Was insolvent, or became insolvent as a result thereof;

    e.　Was engaged or was about to engage in a business or a transaction for which any property remaining of the Debtor was of unreasonably small capital; or

    f.　Intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

81.　　On information and belief, the Debtor was insolvent, or became insolvent as a result of the Fund Transfer.

82.　　On information and belief, there exist other creditors of the Debtor whose claims arose before the Fund Transfer.

83.　　The acts of the Chery Parties were undertaken for improper purposes as alleged above and were willful, wanton, deliberate, malicious, and in conscious disregard of the rights of the Estate's creditors, and were designed and intended to cause and did, in fact, cause the Estate's

1  creditors to suffer actual damages and therefore justify the awarding of exemplary and punitive

2  damages.

3      84.    Accordingly, the Fund Transfer is avoidable, and should be avoided, as

4  constructively fraudulent pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550.

5                          **SECOND CLAIM FOR RELIEF**

6                  **(Avoidance of Constructively Fraudulent Transfer)**

7  **[11 U.S.C. §§ 544(b), and 550, and Cal. Civ. Code §§ 3439.04(a)(2), 3439.05, and 3439.07]**

8      85.    The Trustee realleges and incorporates herein by reference each and every allegation

9  contained in all prior paragraphs of this Complaint.

10      86.    The Trustee is entitled to avoid the Fund Transfer pursuant to Bankruptcy Code

11  section 544(b).

12      87.    On information and belief, the Debtors received no engineering services, and thus

13  did not receive reasonably equivalent value in exchange for the Fund Transfer.  In fact, the Debtors

14  received virtually no value in return—as the deal failed due to the Chery Parties' failure to disclose

15  the IP issues timely and general bad faith—and the Chery Parties ignored the Debtors' requests for

16  what engineering services had been performed and what costs and expenses had been incurred.

17      88.    At the time of the Fund Transfer, the Debtor either:

18          a.  Was insolvent, or became insolvent as a result thereof;

19          b.  Was engaged or was about to engage in a business or a transaction for which
20              any property remaining of the Debtor was of unreasonably small capital; or

21          c.  Intended to incur, or believed that it would incur, debts beyond its ability to pay
22              as such debts matured.

23      89.    On information and belief, the Debtor was insolvent, or became insolvent as a result

24  of the Fund Transfer.

25      90.    On information and belief, there exist other creditors of the Debtor whose claims

26  arose before the Fund Transfer.

27      91.    The acts of the Chery Parties were undertaken for improper purposes as alleged

28  above and were willful, wanton, deliberate, malicious, and in conscious disregard of the rights of

1    the Estate's creditors, and were designed and intended to cause and did, in fact, cause the Estate's

2    creditors to suffer actual damages and therefore justify the awarding of exemplary and punitive

3    damages.

4        92.    The Trustee seeks all available relief under Cal. Civ. Code § 3439.07, including

5    exemplary damages.

6        93.    By reason of the foregoing, the Trustee may avoid the Fund Transfer under 11

7    U.S.C. §§ 544(b), and Cal. Civ. Code §§ 3439.04(a)(2), 3439.05, and 3439.07.

8                         **THIRD CLAIM FOR RELIEF**

9                         **(Fraudulent Concealment)**

10       94.    The Trustee realleges and incorporates herein by reference each and every allegation

11   contained in all prior paragraphs of this Complaint.

12       95.    In May 2021, the Chery Parties disclosed 49 IP issues, including two "high risk"

13   issues, many of which were or should have been known to the Chery Parties much earlier on, and

14   perhaps even when they first began the engineering services.  The two "high risk" issues that would

15   require engineering changes to the design of the vehicle models and/or finding another supplier just

16   a month after the Debtors authorized the use of the Funds.

17       96.    The Chery Parties failed to disclose the IP issues until the month after the Debtors

18   had authorized the transfer of the Funds, even though the Debtors would not have consented to the

19   transfer of the Funds had the Debtors known the number and severity of the IP issues.

20       97.    Consequently, the Chery Parties concealed or suppressed material facts—the

21   unresolved IP issues—until after they had received the Fund Transfer and obtained authorization

22   to use the Funds.

23       98.    The Chery Parties were under a duty to disclose this information to the Debtors, as

24   the Debtors would not have consented to the use of the Funds had they been aware of the severity

25   and extent of IP issues.

26       99.    The Chery Parties intentionally concealed or suppressed these facts with the intent

27   to defraud the Debtors so that the Debtors would consent to the transfer and use of the Funds.

28       100.    The Debtors were not aware of the IP issues and instead only learned of them in

1  May 2021, after the Debtors had agreed to the release of the Funds to the Chery Parties and

2  consented to the use of the Funds by Sicar for the engineering services.

3      101.    This concealment or suppression of material facts directly led to the Debtors

4  authorizing the Fund Transfer and the use of the Funds, *i.e.*, $13.7 million USD and suffering a loss

5  in the same amount when the deal later fell apart after it was apparent that Sicar could not provide

6  the engineering services on a reasonable timeline.

7      102.    Moreover, the Debtor suffered not just economic losses in the Transferred Fund, but

8  the loss of the Debtor's entire business, as the Chery Parties' bad faith caused the JV negotiations

9  and the JV to fail, which meant that the Debtor's business was not sustainable.  Consequently, the

10  Debtor was forced to seek chapter 7 relief.

11                    **FOURTH CLAIM FOR RELIEF**

12               **(Recovery and Preservation of Avoided Transfers)**

13                    **[11 U.S.C. §§ 550 and 551]**

14      103.    The Trustee realleges and incorporates herein by reference each and every allegation

15  contained in all prior paragraphs of this Complaint.

16      104.    The Trustee is entitled to avoid the Fund Transfer pursuant to Bankruptcy Code

17  sections 544 and 548 and Cal. Civ. Code §§ 3439.04(a)(2), 3439.05, and 3439.07.

18      105.    The Chery Parties were the initial transferee of the Fund Transfer or the immediate

19  or mediate transferee of such initial transferee or the entities for whose benefit the Fund Transfer

20  was made.

21      106.    Accordingly, the Fund Transfer should be avoided as fraudulent as set forth in the

22  First and Second Claims above, and such property, or the value thereof, should be recovered and

23  preserved for the benefit of the Estate pursuant to 11 U.S.C. § 550.

24                    **FIFTH CLAIM FOR RELIEF**

25                 **(Accounting of Property of the Estate)**

26                       **[11 U.S.C. § 542]**

27      107.    The Trustee realleges and incorporates herein by reference each and every allegation

28  contained in all prior paragraphs of this Complaint.

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

108.    The Chery Parties received a transfer of prepetition assets of the Debtor and obtained the Fund Transfer due to concealing the 49 IP issues and are thus in possession of property of the Estate.  Despite having received over $17 million USD from the Debtors, the Chery Parties never provided information on—and indeed, ignored the Debtors' requests for—what engineering services they performed and what costs and expenses they had incurred.

109.    Accordingly, the Chery Parties are both required to account for such property, including, but not limited to, the Chery Parties' expenses and costs for performing the engineering services, if any.

### SIXTH CLAIM FOR RELIEF

### (Turnover)

### [11 U.S.C. § 542]

110.    The Trustee realleges and incorporates herein by reference each and every allegation contained in all prior paragraphs of this Complaint.

111.    Even after the Debtors transferred the Funds to Sicar, as the parties continued to negotiate the terms of the ESA following execution, the parties understood that the Debtors still had authority over the use of the Funds, as shown by the Fund Release Letter from Sicar requesting confirmation from HAAH Motors that Sicar could use the Funds.

112.    The Funds are property of the Estate and are not of inconsequential value to the Estate.

113.    Accordingly, the Trustee is entitled to a judgment for turnover of the full amount of the Funds paid to the Chery Parties.

### PRAYER FOR RELIEF

WHEREFORE, the Trustee requests judgment on his Complaint as follows:

**On the First Claim for Relief:**

1.    Avoiding and recovering the transfers of the Funds, which are the Debtor's monies and property, for the benefit of the Estate, including exemplary damages.

**On the Second Claim for Relief:**

2.    Avoiding and recovering the transfers of the Funds, which are the Debtor's monies

1  and property, for the benefit of the Estate, as well as all available relief under Cal. Civ. Code §

2  3439.07, including exemplary damages;

3       **On the Third Claim for Relief:**

4       3.      Compensatory damages and punitive damages from the Chery Parties, jointly and

5  severally, the exact amount of which to be proved at trial, and presently alleged to be no less than

6  $13,700,743.14 USD;

7       **On the Fourth Claim for Relief:**

8       4.      Avoiding and recovering the transfer of the Debtor's monies and property, or the

9  value thereof, for the benefit of the Estate;

10      **On the Fifth Claim for Relief:**

11      5.      Ordering the Chery Parties to provide detailed records of the engineering services

12 they performed and their expenses and costs in performing the engineering services;

13      **On the Sixth Claim for Relief:**

14      6.      Turnover of the Funds;

15      7.      For such other further relief as the Court may deem appropriate.

16

17  Dated:  November 29, 2023                    Respectfully submitted,

18                                               **ARENTFOX SCHIFF LLP**

19

20                                               By: */s/ Aram Ordubegian*
                                                     _____
21                                                   Aram Ordubegian
                                                     Jackson D. Toof
22                                                   Annie Y. Stoops
                                                     Sophia R. Wang
23                                                   Special Litigation Counsel for Richard A.
                                                     Marshack, Chapter 7 Trustee
24

25

26

27

28

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

# EXHIBIT 1

---

## ENGINEERING SERVICES AGREEMENT

---

dated

### 12 OCTOBER 2019

by

## HAAH MOTORS HOLDINGS, INC.
HAAH

and

## SHANGHAI SICAR AUTOMOBILE TECHNOLOGY DEVELOPMENT CO., LTD.
Sicar

## TABLE OF CONTENTS

1.  DEFINITIONS ........................................................................................................... 1

2.  ENGINEERING SERVICES ..................................................................................... 4

3.  PAYMENT FOR SERVICES ..................................................................................... 6

4.  TITLE AND INTELLECTUAL PROPERTY RIGHTS ........................................... 7

5.  REPRESENTATIONS AND WARRANTIES ........................................................... 8

6.  CONFIDENTIALITY .................................................................................................. 9

7.  TERM; TERMINATION ............................................................................................ 10

8.  CONSEQUENCES OF TERMINATION .................................................................. 11

9.  INDEMNITY; DEFENSE OF CLAIMS .................................................................... 11

10. LIMITS ON LIABILITY ............................................................................................ 12

11. FORCE MAJEURE .................................................................................................... 12

12. PUBLIC ANNOUNCEMENTS .................................................................................. 13

13. ABSENCE OF A PRINCIPAL/AGENT RELATIONSHIP; NO PARTNERSHIP ... 13

14. AMENDMENT; ASSIGNMENT .............................................................................. 13

15. WAIVER ..................................................................................................................... 13

16. CUMULATIVE REMEDIES ..................................................................................... 13

17. ENTIRE AGREEMENT ............................................................................................ 13

18. SEVERABILITY ........................................................................................................ 14

19. NO THIRD PARTY BENEFICIARIES .................................................................... 14

20. SUCCESSORS AND ASSIGNS ............................................................................... 14

21. NOTICES .................................................................................................................... 14

22. GOVERNING LAW .................................................................................................... 14

23. DISPUTE RESOLUTION ......................................................................................... 15

24. COSTS ........................................................................................................................ 15

25. COUNTERPARTS ...................................................................................................... 15



**ENGINEERING SERVICES AGREEMENT**

This **Engineering Services Agreement** is made and entered into on 12 October 2019

**between**

**HAAH Motors Holdings, Inc.**, a corporation duly organized and existing under the laws of the State of Delaware whose principal place of business is at 29 Parker, Irvine, CA 92618 USA ("**HAAH**"); and

**Shanghai Sicar Automobile Technology Development Co., Ltd.**, a corporation duly organized and existing under the laws of the People's Republic of China whose principal place of business is First Floor, Block One, 251 Yaohua Road, China (Shanghai) Pilot Free Trade Zone, P.R. China ("**Sicar**").

**Sicar** and **HAAH** are hereinafter jointly referred to as the "**Parties**" and individually as a "**Party**".

**PREAMBLE**

A.      Whereas, the Parties have entered into a Supply Agreement (the "**Supply Agreement**") for HAAH to distribute certain Exeed vehicle models in the United States of America (including the territory of the Commonwealth of Puerto Rico) and Canada.

B.      Whereas, the Parties wish to cooperate to modify certain Exeed vehicle models for the purposes of marketability and meeting homologation requirements in the United States of America and Canada on the terms and conditions set forth herein.

**AGREEMENT**

**NOW, THEREFORE**, in consideration of the premises set forth above, the mutual promises and covenants contained herein and other good and valuable consideration, the adequacy of which is hereby acknowledged, and on the basis of the principles of equality and mutual benefit and through friendly negotiation, the Parties hereby agree as follows:

**1.      DEFINITIONS**

1.1      "**Action**" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, grievance, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, judicial, regulatory or other, whether at law, in equity or otherwise.

1.2      "**Affected Party**" has the meaning given to it in Section 11.1.

1.3      "**Affiliate**" means, with respect to a specified Person, a Person that directly or indirectly Controls, is Controlled by or is under common Control with, the specified Person. In addition to the foregoing, if the specified Person is an individual, the term "Affiliate" also includes (a) the individual's spouse, (b) the members of the immediate family (including parents, siblings and sons/daughters) of the individual or of the individual's spouse, and (c) any legal entity, firm, company, corporation, association, partnership, trust, investment fund or entity that, directly or indirectly, is Controlled by or is created solely for the benefit of any of the foregoing individuals.

1.4      "**Agreement**" means this Engineering Services Agreement together with any subsequent amendments.

1.5      "**Business Day**" means a day (other than a Saturday, Sunday or public holiday) on which licensed banks are generally open for business in the PRC and the USA.

22

1.6     **"Confidential Information"** has the meaning given to it in Section 6.1.

1.7     **"Control"** of a Person (including for purposes of references to the terms **"Controlling"**, **"Controlled by"** and **"under common Control with"**) means ownership of more than fifty percent (50%) of the voting stock or share capital of a Person or the power, directly or indirectly, through the ownership of voting securities or by agreement, either to: (i) vote a majority of the securities having ordinary voting power; (ii) determine the majority of the members of the board of directors or board of officers of such person; or (iii) direct or cause the direction of the management and policies of such person whether by contract or otherwise.

1.8     **"Developments"** means and includes any and all designs, Inventions, products, applications, localisations, corrections, improvements, derivatives, or any other materials or technology that is developed, designed or created by, for or on behalf of Sicar during the course of providing Engineering Services hereunder.

1.9     **"Disclosing Party"** has the meaning given to it in Section 6.1.

1.10    **"Dispute"** has the meaning given to it in Section 23.1.

1.11    **"Documentation"** means and includes any and all technical data, plans, documents, reports and materials prepared or developed by, for or on behalf of Sicar in connection with the Engineering Services.

1.12    **"Engineering Services"** has the meaning given to it in Section 2.1.

1.13    **"Engineering Services Fees"** has the meaning given to it in Section 3.1.

1.14    **"Event of Default"** has the meaning given to it in Section 7.3.

1.15    **"Exeed Vehicles"** means the Exeed brand vehicle models set out in Schedule 1, which may be supplemented or modified from time to time by the Parties in writing.

1.16    **"Force Majeure"** has the meaning given to it in Section 11.2.

1.17    **"Governmental Authority"** means any national government, state, municipality, locality or other political subdivision thereof and any entity, body, agent, commission or court, whether domestic, foreign or multinational, exercising executive, legislative, judicial, regulatory or administrative functions of, or pertaining to, government and any executive official thereof.

1.18    **"Homologation Requirements"** means the homologation requirements of the USA and Canada that are applicable to the Exeed Vehicles from time to time, including those set out in Schedule 3.

1.19    **"Intellectual Property Rights"** means any rights in and in relation to confidential information, Inventions (whether patentable or not), patent rights, registered designs, design rights, database rights, copyrights (including rights in software), moral rights, semiconductor topography rights, utility models, unregistered or registered trade and service marks, logos, get-up and trade names and, in each case, the goodwill attaching to them, all registered intellectual property rights and applications therefor, know-how and Trade Secrets, and any rights or forms of protection of a similar nature and having equivalent or similar effect to any of them which subsist anywhere in the world, whether enforceable, registered, unregistered or registerable (including, where applicable, all applications for registration) and the right to sue for damages for past and current infringement (including passing off and unfair competition) in respect of any of the same.

1.20    **"Inventions"** means findings, discoveries, inventions, additions, modifications, formulations, variations, enhancements, refinements or derivative works (whether or not patentable).

1.21    **"Law"** means any national, federal, state, provincial, local, municipal, foreign, international, multinational, or other constitution, law, statute, treaty, rule, regulation, ordinance, code,

23

binding case law or principle of common law.

1.22    **"Losses"** means losses, damages, liabilities, fines, penalties, costs, charges, and expenses of whatever kind (including attorneys' or other fees, the costs of enforcing any right, and the cost of pursuing any insurance providers).

1.23    **"Person"** means an individual, legal person or entity, corporation, company, firm, partnership, limited partnership, syndicate, trust, association or entity or Governmental Authority, political subdivision, agency of instrumentality of a Governmental Authority (whether or not having separate legal personality and irrespective of the jurisdiction in or under the law of which it was incorporated or exists).

1.24    **"PRC"** or **"China"** means the People's Republic of China, and for the purpose of this Agreement only, excluding Taiwan and the Hong Kong and Macau Special Administrative Regions.

1.25    **"Receiving Party"** has the meaning given to it in Section 6.1.

1.26    **"Representatives"** means the employees, directors, officers, agents, subcontractors, shareholders, attorneys, advisors, successors and permitted assigns of a Party and its Affiliates respectively.

1.27    **"Sicar Indemnified Parties"** has the meaning given to it in Section 9.1.

1.28    **"Supply Agreement"** has the meaning given to it in the Preamble.

1.29    **"Territory"** has the meaning given to it in the Supply Agreement.

1.30    **"Third Party"** means a Person that is not a Party.

1.31    **"Trade Secrets"** means all Inventions, trade secrets, business and technical information and know-how, databases, data collections, patent disclosures and other confidential and proprietary information and all rights therein.

1.32    **"Work Product"** has the meaning given to it in Section 4.1.

1.33    **"USA"** means the United States of America, excluding the territory of the Commonwealth of Puerto Rico for purposes of this Agreement.

1.34    For purposes of this Agreement, unless the specific context requires otherwise:

(a)    The singular includes the plural and the plural includes the singular; words importing any gender include all other genders.

(b)    References to any law, regulation or other statutory provision include reference to such law or regulation or provision as modified, amended, extended, replaced or re-enacted, whether before or after the date hereof.

(c)    References to any document (including this Agreement) are references to that document as amended, consolidated, supplemented, novated or replaced from time to time.

(d)    References to individuals, legal entities or parties include their respective permitted successors and assigns.

(e)    References to "Sections" or "Schedules" are references to Sections or Schedules which form part of this Agreement, except as otherwise specifically indicated.

(f)    The headings included in this Agreement and its Schedules are inserted for convenience only and shall not affect the construction of this Agreement.

(g)    The words "include" and "including" shall be deemed to include "without limitation".

24

(h)  The words "herein hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section or other subdivision.

(i)  Where any word or phrase is given a defined meaning in this Agreement any other part of speech or other grammatical form of that word or phrase shall have a corresponding meaning.

(j)  The words "directly or indirectly" mean directly or indirectly through one or more intermediary Persons (including an Affiliate) or through contractual or other legal arrangements, and "direct or indirect" shall have correlative meanings.

(k)  The Recitals and Schedules constitute an integral part of this Agreement. In case of conflict between the provisions of the body of this Agreement and any Schedule, the provisions of the body of this Agreement shall prevail.

(l)  References to USD or US$ are references to United States Dollars, the legal currency of the United States of America.

(m)  Rights may be exercised or not, at their holder's sole discretion.

(n)  Whenever this Agreement refers to a number of days (other than Business Days), such number shall refer to calendar days. All periods of time and terms shall be counted excluding the date of the event that causes such period or term to begin and including the last day on which such period or term ends.

## 2.   ENGINEERING SERVICES

2.1   In consideration of the payment of the Engineering Services Fees by HAAH, Sicar agrees to use its commercially reasonable efforts to perform the engineering services for which Sicar is responsible to be set out in Schedule 2 (the "**Engineering Services**") for purposes of modifying the Exeed Vehicles to meet the Homologation Requirements and market expectations in the Territory, according to timetables mutually established by HAAH and Sicar from time to time. The respective roles and responsibilities of the Parties for purposes of the Engineering Services are to be set out in Schedule 2.  For the avoidance of doubt, the Engineering Services do not include the services and activities for which HAAH is responsible as will be set out in Schedule 2.  HAAH shall be solely responsible for carrying out the services and activities for which HAAH is responsible as will be set out in Schedule 2.

2.2   Within three (3) weeks following the date of this Agreement (or such other time period as the Parties may agree in writing), the Parties shall discuss in good faith and agree on the contents of Schedule 2 and Schedule 4 (including the respective roles and responsibilities of the Parties in carrying out homologation activities for Exeed Vehicles and the location where such activities are to be performed).  Upon reaching agreement, the Parties shall initial the agreed Schedule 2 and Schedule 4, which shall thereupon be incorporated into this Agreement.  If the Parties fail to reach agreement on and initial Schedule 2 and Schedule 4 within such three (3)-week period (or such other time period as the Parties may agree in writing), either Party may terminate this Agreement upon written notice to the other Party.

2.3   Within two (2) weeks following the date of this Agreement, HAAH shall advise and inform Sicar of the Homologation Requirements and all related information necessary for Sicar to provide the Engineering Services. HAAH shall respond promptly to any requests for guidance, instruction, clarification and information reasonably required by Sicar to enable it to perform the Engineering Services hereunder.  HAAH shall have the sole and exclusive responsibility for determining and advising Sicar of the Homologation Requirements necessary for Sicar to perform the Engineering Services.  Sicar shall have no obligation to investigate, determine, or verify the Homologation Requirements and no liability for the failure of the Engineering Services to address or comply with any Homologation Requirements with respect to which

HAAH has not informed Sicar in accordance herewith or errors in the Homologation Requirements advised to Sicar by HAAH.

2.4 Sicar shall have the right to engage subcontractors for the performance of the Engineering Services. HAAH shall have the right to engage subcontractors for the performance of the services for which it is responsible hereunder.

2.5 The Parties acknowledge and agree that, as part of providing the Engineering Services hereunder, and for purposes of Sicar cooperating with HAAH in HAAH's performing its obligations under the Supply Agreement to undertake all homologation procedures and obtain all homologation approvals or certificates for Exeed Vehicles, it may be necessary for Sicar to send sample vehicles and engineers to the USA. For this purpose, HAAH shall be responsible for the following, at HAAH's cost and expense:

(a) conducting or arranging for completion of any and all tests, inspections, and certifications of Exeed Vehicles that are required to be conducted or obtained in the USA or by qualified third parties for purposes of meeting the Homologation Requirements, including as set out Schedule 2;

(b) making any and all arrangements for the transport of any test vehicles that are required to be sent to the USA for purposes of meeting the Homologation Requirements, such as inspection and testing, and their return to Sicar in the PRC or lawful disposal in the USA (as Sicar may require, subject to applicable Law), including handling and being responsible for all shipping arrangements, import and export procedures, insurance, storage and other logistical requirements;

(c) preparing any information and documentation required for inspection or testing of vehicles in the USA, with the assistance of Sicar;

(d) with respect to Sicar engineers who are required to travel to the USA as necessary to perform the Engineering Services:

(i) provide documentation and assistance necessary for completing the formalities (including visas and other travel documentation) in order for Sicar engineers to travel to the USA;

(ii) arrange qualified interpreters at the disposal of Sicar engineers;

(iii) make its premises and necessary facilities (such as telephone line and Internet connection) available to Sicar engineers on a temporary basis for them to carry out their work at HAAH's premises;

(iv) arranging for accommodation (3 stars or equivalent) with breakfast for Sicar engineers, and bearing the following cost and expenses: (A) round trip economy class or better plane tickets from China to USA; (B) transportation between the USA airport, hotel and the premises where the relevant Engineering Service is carried out; (C) accommodation and other reasonable living and travelling expenses of Sicar engineers incurred in connection with the Engineering Services to be provided in the USA.

2.6 HAAH shall purchase from and pay Sicar for any test vehicles that are required to be sent to the USA for purposes of meeting the Homologation Requirements.

2.7 Upon completion of any Engineering Services hereunder, Sicar shall deliver to HAAH all Documentation and information relating thereto reasonably required by HAAH for purposes of completing homologation procedures. HAAH shall promptly review such Documentation and notify Sicar of any failure to meet Homologation Requirements identified by HAAH with respect to the Engineering Services results or Documentation within ten (10) Business Days

26

after receipt of such Documentation and anytime thereafter upon becoming aware of any such failure, within five (5) Business Days after becoming aware of any such failure. If Sicar agrees with HAAH's assessment, Sicar shall use its commercially reasonable efforts to correct such failure. If Sicar does not agree with HAAH's assessment, the Parties shall discuss in good faith to resolve the disagreement. If HAAH fails to inform Sicar of the failure within the time limits specified in this Section, Sicar shall have no obligation to correct such failure, and HAAH shall be solely responsible for correcting such failure at its own cost. HAAH shall not use the Documentation for any purpose other than completing homologation procedures for the Exeed Vehicles. HAAH shall not permit any Third Party (including dealers of Exeed Vehicles) to use the Documentation unless such Third Party has entered into a non-disclosure agreement with HAAH regarding the Documentation and the Third Party's use of the Documentation is limited to homologation procedures for the Exeed Vehicles.

2.8    Sicar shall be entitled to suspend all Engineering Services to HAAH immediately upon any failure of HAAH to comply with its obligations under this Agreement, including failure to comply with the payment provisions in Section 3.2.

2.9    Sicar is and shall remain an independent contractor and shall be solely responsible for determining the manner, means and methods by which Sicar performs its obligations hereunder.

## 3.    PAYMENT FOR SERVICES

3.1    In consideration for the Engineering Services performed by Sicar hereunder, HAAH shall bear all fees, costs and expenses relating to the Engineering Services (the "**Engineering Services Fees**"). The Engineering Services Fees with respect to Engineering Services under Schedule 2 shall be no less than fifty-eight million USD (US$58,000,000), and Sicar may require HAAH to pay a portion or all of the Engineering Services Fees to a Third Party who carries out any part of the Engineering Services.

(a)    If the Engineering Services Fees exceed fifty-eight million USD (US$58,000,000), the Parties shall discuss in good faith whether to proceed with the Engineering Services and the payment of additional Engineering Service Fees, if any. If the Parties cannot reach agreement within thirty (30) days of Sicar notifying HAAH in writing that the total Engineering Service Fees exceed fifty-eight million USD (US$58,000,000), either Party may terminate this Agreement upon written notice to the other Party.

3.2    The Engineering Services Fees shall be payable by HAAH to Sicar in the following instalments:

(a)    one million USD (US$1,000,000) within three (3) weeks after the date of this Agreement, so that Sicar may commence work on the Engineering Services;

(b)    within one-hundred twenty (120) days after the date of this Agreement, sixteen million USD (US$16,000,000);

(c)    within nine (9) months after the date of this Agreement, eight million USD (US$8,000,000)

(d)    after completion of the Fourth Instalment Milestone set out in Schedule 4, but in no event later than within fourteen (14) months after the date of this Agreement, sixteen million five hundred thousand USD (US$16,500,000); and

(e)    after completion of the Fifth Instalment Milestone set out in Schedule 4, but in no event later than within twenty (20) months after the date of this Agreement, sixteen million five hundred thousand USD (US$16,500,000).

3.3     Upon completion of the Fourth Instalment Milestone and Fifth Instalment Milestone set out in Schedule 4 respectively, Sicar shall notify HAAH in writing that the relevant milestone is complete. If HAAH disputes the completion of a milestone notified by Sicar, it shall notify Sicar in writing, and the Parties shall resolve such dispute in accordance with Section 23.1. Notwithstanding any dispute HAAH may have regarding a completed milestone notified by Sicar, HAAH shall make payment in accordance with Section 3.2.

3.4     All Engineering Services Fees shall be payable in United States Dollars or such other currency as agreed upon by the Parties from time to time. HAAH shall pay all invoiced amounts of Engineering Services Fees due to Sicar by wire transfer of immediately available funds to an account designated by Sicar within the time limits set forth in Section 3.2. Any and all banking charges, fees and commissions incurred domestically with respect to such payments to Sicar pursuant to this Agreement shall be borne by HAAH. If applicable Law requires a deduction or withholding to be made by HAAH on payments to Sicar, HAAH shall pay such additional amount as will ensure that the net amount Sicar receives equals the full amount which it would have received had the deduction or withholding not been required.

3.5     If any sum is due and not paid within the time limits set forth in Section 3.2, interest shall be payable by HAAH to Sicar on such overdue sums. Such interest shall accrue and be calculated on a daily basis at the rate of six percent (6%) above the then-effective one-year LIBOR rate per annum from the date such amount becomes overdue until the date of Sicar's actual receipt of payment thereof. The payment of such interest shall not be an exclusive remedy, nor shall it be in lieu of any other remedy to which Sicar may be entitled by virtue of any default by HAAH in making any payment to be made by it under the terms of this Agreement.

3.6     All payments of the Engineering Services Fees hereunder shall be non-refundable in the event of termination of this Agreement for any reason. Without limiting the generality of the foregoing, if any instalment under Section 3.2 is not paid as required by Section 3.2, then in addition to any other remedies available to Sicar hereunder, the prior instalment payments under Section 3.2 will not be refundable under any circumstances, whether or not the funds have been spent.

3.7     Upon HAAH's request, Sicar shall provide its books and records with respect to the costs and expenses incurred by Sicar (and its Affiliates) and comprising the Engineering Service Fees and such other evidence of the same as HAAH may reasonably request. Unless HAAH identifies errors in Sicar's calculation of the amount of Engineering Service Fees payable by HAAH based on such costs and expenses, HAAH shall have no right, on the basis of its review of such costs and expenses, to refuse to pay the amount of Engineering Service Fees payable by HAAH hereunder. If HAAH identifies errors in Sicar's calculation of the amount of Engineering Service Fees payable by HAAH based on such costs and expenses, Sicar shall correct such errors accordingly.

3.8     Upon Sicar receiving payment from HAAH of at least seventeen million USD (US$17,000,000), HAAH shall have the right to publicly announce its cooperation with Sicar hereunder and with Sicar under the Supply Agreement, provided that the detailed terms and conditions of such cooperation are not disclosed. Prior to that, HAAH shall not make any public announcements in respect of the same without the prior written consent of Sicar, except that HAAH may inform relevant dealers and lenders of such cooperation, provided that such dealers and lenders have executed non-disclosure agreements with HAAH under which they are bound to not disclose such cooperation to any party without the prior written consent of HAAH.

## 4.     TITLE AND INTELLECTUAL PROPERTY RIGHTS

4.1     Sicar and HAAH hereby agree that all vehicles, parts, Intellectual Property Rights, Developments and Documentation relating to the Engineering Services ("**Work Product**")

28

shall be the sole and exclusive property of Sicar, and all rights, title and interest therein shall automatically vest in Sicar at the time that such vehicles, parts, Intellectual Property Rights, Developments and Documentation are first created.

(a)     In the event that any or all rights, title or interest in and to any Work Product are deemed not to vest in Sicar, for any reason whatsoever, HAAH shall, and hereby does, irrevocably assign, transfer and convey to Sicar, all such rights, title and interest in and to all Work Product, including all economic rights and moral rights of authorship.

(b)     In the event that, as a matter of law, any of the foregoing rights are not assignable by HAAH to Sicar, as provided in this Section 4.1, HAAH shall, and hereby does, grant to Sicar a perpetual, exclusive, royalty-free license to all such rights.

(c)     HAAH shall use commercially reasonable efforts to take all actions, including the execution and delivery to Sicar, or filing with appropriate government agencies, all documents and other materials, as reasonably requested by Sicar, in order to permit Sicar to perfect and protect its ownership of all rights, title and interest in and to all of the Work Product.

## 5.     REPRESENTATIONS AND WARRANTIES

5.1     Each of Sicar and HAAH represents and warrants to the other Party that:

(a)     it is a corporation (in the case of HAAH) or limited liability company (in the case of Sicar) duly organised, validly existing and in good standing under the laws of its jurisdiction of incorporation;

(b)     it is duly qualified to do business and is in good standing in every jurisdiction in which such qualification is required, except where the failure to be so qualified, in the aggregate, would not reasonably be expected to adversely affect its ability to perform its obligations under this Agreement;

(c)     it has the full right, power and authority to enter into this Agreement, to grant the rights and licenses granted under this Agreement and to perform its obligations under this Agreement;

(d)     the execution of this Agreement by its representative whose signature is set forth at the end hereof has been duly authorised by all necessary action of it;

(e)     when executed and delivered by each of HAAH and Sicar, this Agreement will constitute its legal, valid and binding obligation, enforceable against it in accordance with its terms;

(f)     it is in compliance in all material respects with all Laws applicable to the performance of its obligations under this Agreement;

(g)     the execution, delivery and performance of this Agreement will not require it to obtain any consent or approval of any Third Party, and will not constitute a default or result in any breach under or of any agreement to which it is a party or its articles of association or bylaws, operating agreement or other organizational documents; and

(h)     there are no Actions pending or threatened against it which would restrict or have a material adverse effect on its ability to carry out the transactions and obligations contemplated by this Agreement.

5.2     Sicar does not represent or warrant that its Engineering Services will be successful, in whole or in part, or result in certification of Exeed Vehicles as meeting Homologation Requirements. To the extent that Sicar has used its commercially reasonable efforts hereunder, Sicar shall have

no liability to HAAH for any failure of the Exeed Vehicles to meet any homologation requirements or obtain homologation certification, or for any delays in providing the Engineering Services hereunder.

5.3     SICAR MAKES NO REPRESENTATION, WARRANTY, OR ASSURANCE OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, AS TO THE ENGINEERING SERVICES OR AS TO ANY CONDITION, PERFORMANCE, SATISFACTORY QUALITY, NON-INFRINGEMENT OF THIRD PARTY RIGHTS, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND ALL SUCH REPRESENTATIONS, WARRANTIES, AND ASSURANCES ARE SPECIFICALLY EXCLUDED AND DISCLAIMED.

## 6.     CONFIDENTIALITY

6.1     From time to time during the term of this Agreement, either Party (as **"Disclosing Party"**) may disclose or make available to the other Party (as **"Receiving Party"**) information about its business affairs, goods and services, forecasts, confidential information and materials comprising or relating to intellectual property, Third Party confidential information and other sensitive or proprietary information, including customer and supplier lists, Trade Secrets, designs, drawings, processes, formulas, ingredients, business plans and strategies, financial information, pricing information, specifications, devices, research and development data, manufacturing and processing data, clinical and engineering data, purchasing and marketing data, samples, and items similar to the foregoing; such information, as well as the terms of this Agreement including the existence thereof, whether orally or in written, electronic or other form or media and whether or not marked, designated or otherwise identified as "confidential" constitutes **"Confidential Information"** hereunder.   Confidential Information excludes information that:

(a)     is or becomes generally available to and known by the public other than as a result of, directly or indirectly, any breach of this Section 6 by Receiving Party or any of its Representatives;

(b)     is or becomes available to Receiving Party on a non-confidential basis from a Third Party source, provided that such Third Party is not and was not prohibited from disclosing such Confidential Information;

(c)     was known by or in the possession of Receiving Party or its Representatives before being disclosed by or on behalf of Disclosing Party; or

(d)     was or is independently developed by Receiving Party without reference to or use of, in whole or in part, any of Disclosing Party's Confidential Information.

6.2     Receiving Party shall, for the term of this Agreement and thereafter for as long as the relevant information remains Confidential Information:

(a)     protect and safeguard the confidentiality of Disclosing Party's Confidential Information with at least the same degree of care as Receiving Party would protect its own Confidential Information, but in no event with less than a commercially reasonable degree of care;

(b)     not use Disclosing Party's Confidential Information, or permit it to be accessed or used, for any purpose other than to exercise its rights or perform its obligations under this Agreement; and

(c)     not disclose any such Confidential Information to any Person, except (i) to Receiving Party's Representatives on a need-to-know basis to assist Receiving Party, or act on its behalf, to exercise its rights or perform its obligations under this Agreement, or (ii)

pursuant to applicable Law or a valid order issued by a court or Governmental Authority of competent jurisdiction, provided that Receiving Party shall first provide Disclosing Party with (A) prompt notice of such requirement so that Disclosing Party may seek, at its sole cost and expense, a protective order or other remedy, and (B) reasonable assistance, at Disclosing Party's sole cost and expense, in opposing such disclosure or seeking a protective order or other limitations on disclosure.

Proprietary know-how will remain confidential in perpetuity and Trade Secrets shall remain confidential so long as they remain a trade secret.

6.3   Subject to Section 8.1, upon the termination of this Agreement:

(a)    each Party shall promptly destroy all documents and tangible materials (and any copies) containing, reflecting, incorporating or based on the other Party's Confidential Information, unless otherwise required by applicable Laws; and

(b)    each Party shall promptly permanently erase all of the other Party's Confidential Information from its computer systems, unless otherwise required by applicable Laws.

6.4   The Receiving Party shall be responsible for any breach of this Section 6 caused by any of its Representatives.

6.5   This Section 6 shall survive any expiration or termination of this Agreement for any reason.

## 7.    TERM; TERMINATION

7.1   This Agreement shall come into force once signed by both Parties and shall remain valid and effective unless and until terminated in accordance with its terms. This Agreement shall automatically terminate upon the termination or expiration of the Supply Agreement.

7.2   This Agreement may terminate at any time with the written agreement of both Parties.

7.3   If either Party defaults in the performance of any material obligation assumed under this Agreement (an **"Event of Default"**), then the non-defaulting Party may give written notice to the defaulting Party which notice shall specify the Event of Default. After receipt of such notice, the defaulting Party shall have a period of thirty (30) days in which to cure the Event of Default. If such Event of Default is not cured within such period, then the non-defaulting Party may terminate this Agreement at any time upon written notice to the defaulting Party. Any such termination shall be without prejudice to any other rights which the non-defaulting Party may have as a result of any breach of this Agreement.

7.4   This Agreement may be terminated upon thirty (30) days' notice from a Party if such termination is compelled by a final order, decree or lawful demand of a Governmental Authority having jurisdiction over such Party.

7.5   Upon occurrence of a change in the Control of HAAH without the prior written consent of Sicar, Sicar may terminate this Agreement by providing a written notice to HAAH within forty (40) calendar days of such change of Control coming to its knowledge.

7.6   This Agreement may be terminated pursuant to Sections 2.2, or 11.4.

7.7   Either Party may immediately terminate this Agreement without any consequences if any of the following or any comparable event occurs: (a) insolvency of the other Party; (b) filing of a voluntary petition in bankruptcy by the other Party; (c) filing of any involuntary petition in bankruptcy against the other Party; (d) appointment of a receiver or trustee for the other Party; or (e) execution of an assignment for the benefit of creditors by the other Party; provided that such petition, appointment or assignment is not vacated or nullified within fifteen (15) Business Days of such event.

31

## 8. CONSEQUENCES OF TERMINATION

8.1 In the event of termination of this Agreement for any reason, either Party may demand from the other the return or destruction of any documents containing Confidential Information in relation to the first Party by notice in writing, whereupon the other Party shall (and shall ensure that its officers and employees shall) promptly: (i) return such documents; and/or (ii) destroy any copies of such documents and any other document or other record reproducing, containing or made from or with reference to such Confidential Information in accordance with Section 6.3.

8.2 The termination of this Agreement for any reason shall be without prejudice to any rights of either Party under this Agreement which may have accrued by, at or up to the date of such termination.

8.3 The following provisions of this Agreement shall remain in full force after termination of this Agreement for whatever reason: Sections 6, 8.3, 9, 22 and 23.

## 9. INDEMNITY; DEFENSE OF CLAIMS

9.1 HAAH agrees to indemnify and hold Sicar, its Affiliates, and their respective officers, directors, agents, and employees (the **"Sicar Indemnified Parties"**) harmless from and against all Actions (including product liability Actions) brought against Sicar Indemnified Parties by a Third Party, and any Losses which arise from or in connection with any Third Party Action (including product liability Action) against a Sicar Indemnified Party that arises from or in connection with HAAH's activities in connection with this Agreement, any breach by HAAH and/or its Affiliates of its obligations under this Agreement, any misuse of the Documentations and/or Engineering Services by HAAH and/or its Affiliates, a defect in any products sold by HAAH, or which arise from or in connection with any Third Party Action against HAAH or Sicar or their respective Affiliates for bodily injury, property damage, product warranty, product liability or infringement of Intellectual Property Rights due to the actions, default or negligence of HAAH and/or its Affiliates. HAAH's indemnity obligations hereunder shall not apply to Actions arising out of Sicar's fraud or wilful misconduct.

9.2 The indemnification rights of Sicar under this Section 9, are without prejudice to, independent of, and in addition to, such other rights and remedies as Sicar may have at law or in equity or otherwise.

9.3 If a Third Party takes any Action against HAAH, or jointly against HAAH and Sicar, in relation to this Agreement or the Engineering Services, including the design, quality, manufacturing, servicing, or recall of vehicles or parts supplied by Sicar to HAAH, HAAH shall inform Sicar in writing and provide Sicar with the claim letter or email, claim package, complaint, summons, disclosures, and any other documents included therewith, if available.

   (a) Sicar may, in its sole discretion, elect to assume and control the defense at the cost of HAAH if it gives written notice of its intention to do so to HAAH within thirty (30) days after receiving HAAH's notice of such Third Party Action. In that event, HAAH may appoint its own participating non-controlling counsel with respect to such Action, at its own expense. Sicar will keep HAAH apprised of all material developments regarding the Third Party Action being defended by Sicar, will instruct its counsel to cooperate and consult with HAAH's counsel, and will act in good faith and give reasonable consideration to the views of HAAH and its counsel in connection with the defense of such Third Party Action. Before Sicar settles or determines to forego any right of appeal in connection with the Third Party Action pursuant to this Section 9.3, however, Sicar shall give HAAH advance written notice of any proposed settlement or the foregoing of such right, and a reasonable opportunity to consent in writing to the settlement or the foregoing of such right (which consent will not be unreasonably withheld, delayed or conditioned).

32

(b)     In the event HAAH is controlling the defense against any such Third Party Action, Sicar may appoint its own participating non-controlling counsel and will cooperate with HAAH in such defense and make available to HAAH all witnesses, pertinent data, records, materials and information in Sicar's possession or under Sicar's control relating to the Third Party Action as is reasonably required by HAAH. No Third Party Action may be settled prior to a final judgment thereon and no appeal may be foregone by HAAH without the prior written consent of Sicar (which consent will not be unreasonably withheld, delayed or conditioned), unless Sicar is released in full in connection with such settlement.

(c)     Sicar shall have no liability to HAAH for its defense of any Third Party Action or any actions taken or not taken by Sicar in respect thereof.

## 10.    LIMITS ON LIABILITY

10.1    Neither Sicar nor its Representatives shall be liable for consequential, indirect, incidental, special, exemplary, punitive or enhanced damages (excluding any damages arising from Actions subject to indemnification under this Agreement), loss of profits, loss or deferment of revenue, additional or other financing costs, loss of use or any loss in respect of business interruption, damage to reputation and goodwill, or loss of expected future business in connection with or arising out of or relating to the terms of this Agreement or the transactions contemplated hereby or with respect to or the furnishing, performance, or use of any Engineering Services provided pursuant hereto, whether or not the possibility of such damages has been disclosed in advance by HAAH or could have been reasonably foreseen, and regardless of the legal theory (contract, tort, breach of warranty or otherwise) upon which the claim is based, and notwithstanding the failure of any agreed or other remedy of its essential purpose. In no event shall the aggregate liability of Sicar and its Representatives in respect of all claims in relation to the Engineering Services or in connection with this Agreement or arising out of or in connection with any act, omission, event or circumstance or series of acts, omissions, events or circumstances relating to this Agreement exceed twenty percent (20%) of the aggregate amount of Engineering Services Fees payable by HAAH to Sicar under this Agreement in the twelve (12) months immediately preceding the claim, or payable under the first year of this Agreement for claims occurring in the first year of this Agreement.

## 11.    FORCE MAJEURE

11.1    Each Party will be excused from performing its obligations under this Agreement when substantially prevented by Force Majeure, but only after the Party claiming Force Majeure has served notice thereof on the other Party and then for no longer than the Force Majeure exists. The Party whose performance of this Agreement is affected by any Force Majeure event (the "**Affected Party**") shall provide the other with any evidence necessary to verify the occurrence of Force Majeure.

11.2    "**Force Majeure**" mean any event which: (i) is beyond the reasonable control of the Affected Party; (ii) is unforeseen or, if foreseen, is unavoidable; (iii) arises after the date of the execution of this Agreement; and (iv) prevents total or partial performance of this Agreement by any Party. Such events shall include, but not be limited to, floods, fires, droughts, typhoons, earthquakes or other natural disasters, transportation disasters, strikes, civil unrest or disturbance, acts of terrorism, riots and war (whether or not declared) provided that Force Majeure does not include any such Force Majeure event that is due to a Party's willful act, neglect or failure to take reasonable precautions against the relevant Force Majeure event.

11.3    In the event of a Force Majeure, the Affected Party shall use all reasonable endeavours to avoid or mitigate the effects of the event in question and shall, upon the cessation of the Force Majeure, use all reasonable endeavours to make up for any delay, which has occurred.



11.4    It is expressly agreed that each Party may terminate this Agreement upon notice to the other Party without liability in case of a Force Majeure situation lasting more than six (6) months.

11.5    Nothing in this Section 11 shall relieve a Party of its obligation to make payments when due hereunder.

## 12.    PUBLIC ANNOUNCEMENTS

Except as provided in Section 3.8, no Party nor any of its Representatives shall (orally or in writing) publicly disclose, issue any press release or make any other public statement, or otherwise communicate with the media, concerning the existence of this Agreement or the subject matter hereof, without the prior written approval of the other Party, except if and to the extent that such Party (based upon the reasonable advice of counsel) is required to make any public disclosure or filing regarding the subject matter of this Agreement (a) by applicable Law or (b) in connection with enforcing its rights under this Agreement.

## 13.    ABSENCE OF A PRINCIPAL/AGENT RELATIONSHIP; NO PARTNERSHIP

13.1    Nothing herein shall be construed as authorizing HAAH to act, register, or otherwise represent itself as agent for or bind Sicar, nor as establishing any agency relationship between the Parties hereto for any purpose whatsoever. Each Party will perform all of its respective obligations under this Agreement as an independent contractor, and no joint venture, partnership or similar other relationship shall be created or implied by this Agreement.

## 14.    AMENDMENT; ASSIGNMENT

14.1    Any amendment or modification to this Agreement must be made in writing and signed by an authorized representative of the Parties. Except as expressly provided in this Agreement, no Party may assign or transfer this Agreement or any part of this Agreement or any rights or obligations hereunder to or for the benefit of any Person, without the prior written consent of the other Party.

## 15.    WAIVER

Each Party's rights are not prejudiced or restricted by any concession, indulgence or forbearance extended by such Party to the other. A failure or delay by any Party to require the enforcement of any provision of this Agreement is not to be construed as a waiver by such Party of any of its rights, nor does it affect in any way the validity of this Agreement or any of its provisions, or the right to enforce such provisions at any time thereafter. No waiver under this Agreement is effective unless it is in writing, identified as a waiver to this Agreement and signed by an authorized representative of the Party waiving its right. Any waiver authorized on one occasion is effective only in that instance and only for the purpose stated, and does not operate as a waiver on any future occasion.

## 16.    CUMULATIVE REMEDIES

All rights and remedies provided in this Agreement are cumulative and not exclusive, and the exercise by any Party of any right or remedy does not preclude the exercise of any other rights or remedies that may now or subsequently be available at Law, in any other agreement between the Parties or otherwise.

## 17.    ENTIRE AGREEMENT

This Agreement, together with all Schedules referenced herein, is the Parties' entire agreement.

34

It supersedes all prior or contemporaneous oral or written communications, proposals and representations with respect to its subject matter and prevails over any conflicting or additional terms of any quote, order, acknowledgment or similar communications between the Parties during the term of this Agreement.

18.    **SEVERABILITY**

Should any provision of this Agreement be declared illegal, invalid, void or unenforceable by judicial or administrative authority, the validity of the remaining provisions is not affected thereby, and the Parties will in good faith attempt to agree a valid substitute clause that will preserve as near as possible the original intent of this Agreement.

19.    **NO THIRD PARTY BENEFICIARIES**

This Agreement benefits solely the Parties and their respective permitted successors and assigns and nothing in this Agreement, express or implied, confers on any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

20.    **SUCCESSORS AND ASSIGNS**

This Agreement is binding on and inures to the benefit of the Parties and their respective permitted successors and permitted assigns.

21.    **NOTICES**

Any notice required to be given under this Agreement must be given in writing and will be effective on receipt when delivered by registered airmail, international courier, hand delivery, facsimile or e-mail, confirmed by the sending of the original by registered airmail to the Party, at the address stated below or to such other address as such Party may designate by written notice in accordance with the provisions of this Section.

(a)    To Sicar:

Legal Department

First Floor, Block One, 251 Yaohua Road, China (Shanghai) Pilot Free Trade Zone, P.R. China

Attention: Mr. Zhang Jinsong

Telephone: +86 (0553) 7533399

Email: zhangjinsong@mychery.com

(b)    To HAAH:

Suite 200, 29 Parker, Irvine, CA 92618 USA

Attention: Duke Hale and Michael Davis

Telephone: +1 (201) 800 1672

Facsimile: +1 (949) 215 0333

E-mail: michael.davis@HAAHAUTO.com

22.    **GOVERNING LAW**

This Agreement shall be governed, interpreted and enforced in accordance with the Laws of the

PRC, without regard to its principles of conflicts of law.

**23.    DISPUTE RESOLUTION**

23.1    The Parties hereby agree to use their commercial reasonable efforts to resolve any dispute, controversy or claim arising out of or in connection with this Agreement ("**Dispute**"), including any Dispute regarding the existence, validity, effectiveness, interpretation, performance, breach or termination of any provision of this Agreement, in an amicable way, by negotiations in good faith, within thirty (30) calendar days from the receipt of a notice of Dispute. The aforementioned provision notwithstanding, the Parties may submit any and all Disputes to arbitration, pursuant to Section 23.2 below, even before the expiration of the thirty (30)-day term mentioned above.

23.2    The Parties further agree that any and all Disputes shall be submitted to China International Economic and Trade Arbitration Commission ("**CIETAC**") for arbitration which shall be conducted in accordance with CIETAC's arbitration rules ("**CIETAC Rules**") in effect at the time of applying for arbitration and as supplemented or modified by the following provisions of this Section 23.2:

(a)    The law of this Section 23.2 shall be the laws of the PRC.

(b)    The seat or place of arbitration shall be Beijing, the PRC.

(c)    The number of arbitrators shall be three.  The Parties agree that any or all of the three arbitrators may be appointed from outside of CIETAC's Panel of Arbitrators.

(d)    The arbitration proceedings shall be conducted in English.

(e)    The Parties agree that the arbitration shall be conducted according to the CIETAC Guidelines on Evidence in effect at the time of applying for arbitration.

(f)    The arbitral award is final and binding upon the Parties. The Parties agree to be bound by any award and to act accordingly without delay.

(g)    Judgment upon any award and/or order may be entered in any court having jurisdiction thereof. The Parties shall be deemed to have waived their rights to any form of recourse or defence in respect of enforcement and execution of any award, in so far as such waiver can validly be made.

**24.    COSTS**

Each of the Parties shall be responsible for its own legal, accountancy and other costs, charges and expenses incurred in connection with the negotiation, preparation and implementation of this Agreement.

**25.    COUNTERPARTS**

This Agreement may be executed in counterparts, each of which is deemed an original, but all of which together are deemed to be one and the same instrument.

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their duly authorized representatives.

**HAAH Motors Holdings, Inc.**

Name: Duke Hale

Title: Chairman & CEO

**Shanghai Sicar Automobile Technology Development Co., Ltd.**

Name: Zhang Guibing

Title: Authorized Representative

**Schedule 1**
**Exeed Vehicles**

M31T or M32T to be selected by the mutual agreement by the Parties.

| Category | M31T/M32T | | | | M36T | | | |
|---|---|---|---|---|---|---|---|---|
| | Premium | Premium | Luxury | Luxury | Premium | Premium | Luxury | Luxury |
| Engine | 1.6TGDI | 1.6TGDI | 1.6TGDI | 1.6TGDI | 2.0TGDI | 2.0TGDI | 2.0TGDI | 2.0TGDI |
| Transmission | 7DCT | 7DCT | 7DCT | 7DCT | 7DCT | 7DCT | 7DCT | 7DCT |
| Drivetrain | FWD | AWD | FWD | AWD | FWD | AWD | FWD | AWD |

1. The Exeed Vehicles listed above shall not include the facelifts, refresh and replacement models of such Exeed Vehicles.

2. The list of the Exeed Vehicles cited above may be varied and/or supplemented by any other models of Sicar's by mutual written agreement between the Parties.

**Schedule 2**
**Engineering Services**

See schedule 2
folder

### Schedule 3 - Homologation Requirements

**Homologation FMVSS List for Testing & Design per the standards known as of September 2019.**

| FMVSS Standard | Description | Change |
|---|---|---|
| 101 | Controls and displays | Meet the Standard |
| 102 | Transmission shift position sequence, starter interlock, and transmission braking effect | Meet the Standard |
| 103 | Windshield Defrosting and Defogging | Meet the Standard |
| 104 | Windshield whiping and Washing systems | Meet the Standard |
| 106 | Break Hoses | Meet the Standard |
| 108 | Lighting System and Retroflective Devices(Location requirement only) | Meet the Standard |
| 109 | New Pneumatic & Certain specialty Tires | Meet the Standard |
| 110 | Tire selection & Rims | Meet the Standard |
| 111 | Rearview Mirrors | Meet the Standard |
| 113 | Hood Latch Systems | Meet the Standard |
| 114 | Theft Protection-rollaway | Meet the Standard |
| 115 | Vehicle ID Number - VIN | Meet the Standard |
| 116 | Motor Vehicle Brake Fluids | Meet the Standard |
| 118 | Power-Operated Window, Partition & Roof Panel systems | Meet the Standard |
| 124 | accelleratior control systems | Meet the Standard |
| 126 | Electronic stability control systems | Meet the Standard |
| 135 | Light Vehicle Brake Systems | Meet the Standard |
| 138 | Tire Pressure Monitoring Systems | Meet the Standard |
| 139 | New Pneumatic Radial Tires for Light Vehicles | Meet the Standard |
| 201 | Occupant protection in upper interior impact | Meet the Standard |
| 202a | Head Restraints | Meet the Standard |
| 203 | Impact Protection from Steering controle system | Meet the Standard |
| 204 | Steering control rearward displacement | Meet the Standard |
| 205 | Glazing materials | Meet the Standard |
| 206 | Door locks and door retention components | Meet the Standard |
| 207 | Seating Systems | Meet the Standard |
| 208 | Occupant crash protection | Meet the Standard |
| 209 | Seat Belt assemblies | Meet the Standard |
| 210 | Seat Belt assemblies anchorages | Meet the Standard |
| 212 | Windshield Mounting | Meet the Standard |
| 213 | Child restraint systems | Meet the Standard |
| 214 | Side Impact Protection | Meet the Standard |
| | | Meet the Standard |
| | | Meet the Standard |
| 216a | Roof Crush Resistance | Meet the Standard |
| 219 | Windshield Zone Intrusion | Meet the Standard |
| 225 | Child restraint anchorage systems | Meet the Standard |
| 226 | Ejection mitigation | Meet the Standard |
| 301 | Fuel system integrity | Meet the Standard |
| 302 | Flammability of interior materials | Meet the Standard |
| 303-4 | Gaseous fuel - Natual gas | Not Required |
| 305 | Electric Powered vehicles: Electrolyte spillage | Not Required |
| 401 | Interior trunk release | Meet the Standard |
| Part 563 | Event data recorders (EDR) | Meet the Standard |
| Part 575 | Safety Labeling | Meet the Standard |
| Part 581 | Bumpers | Meet the Standard |
| EPA | PWT Emissions | Meet the Standard |
| Other | | |
| | Insurance Instittute for Highway Safety | IIHS Good |
| | Hazardous Materials - Hexavalent chromium | Meet the Standard |
| | Chinese to English | yes |
| | Replace Logo to HAAH Approved Logo | yes |
| | US NCAP | 5 Stars |

**Schedule 4**
**Milestones**

**Fourth Instalment Payment Milestone**

|●|

**Fifth Instalment Payment Milestone**

|●|

# EXHIBIT 2

**Schedule 2**
**Engineering Services**

**Program Content Agreed**

| USD 58 Million | | Additional Cost | Notes 注释 |
|---|---|---|---|
| | | | USD 58 Million intends to cover both Bucket 1 & 2 |
| **Bucket 1** | **Bucket 2** | **Bucket 3** | |
| Legal/homologation 法规/认证 | Mandatory to sell 强制性销售 | Discretionary content 自由支配内容 | |
| -deliverables based/turn key 基于交付物/流包式 | Apple car play 苹果车载系统 | Additional features 额外的配置 | See Features List Duke agrees based on Cost and timing |
| Canada / Legal / Homologation | Android auto 安卓车载系统 | Heated steering wheel 可加热方向盘 | |
| | 10 year corrosion 10 年防腐 | HUD 抬头显示器 | |
| | NCAP 5 star 碰撞测试 5 星 | Lion System #2 #2 Lion 系统 | Lion System 2 is a Upgraded version system #2 Lion 系统是一套升级版系统 |
| | IIHS Good IIHS-良好 | | |
| | Towing 2500 LBS (Min) 2500 磅牵引力（分钟） | | |
| | Sirius/FM radio 天狼星/调频广播 | | |
| | Lion System #1 #1 Lion 系统 | | Lion System 1 is a Basic without Baidu Features #1 Lion 系统是没有百度配置的基础系统 |
| | New Logo Visible Parts 新车标可视件 | | |
| | US Ride and Handling +IQS +NVH | | |
| | US Cold/Hot Start / Altitude | | |

HAAH Final M38T
Features List Final V7

HAAH Final M39T
Features Final List V7

Features Lists

HAAH will pay Sicar USD 58 million to a) legally homologate and b) meet basic market expectations for sale in the USA market.   HAAH will pay Sicar a separately negotiated fee to develop and validate discretionary content which

Schedule 2

OCT. 31, 2019

Bucket 1 "legal homologation" all activities are required to meet and certify to US FMVSS requirements and make the vehicles legally saleable.

Bucket 2 "meet basic market expectations" is all activities required to develop and validate content which are considered basic customer expectations for an SUV in the USA market.

Bucket 3 "discretionary content" payment will be all activities required to develop and validate content which is desired for vehicle competitiveness in the USA market and not available on the M3X architecture.

Bucket 3 content will follow the process of this ESA but payment and payment schedules will be agreed and documented separately.

**Roles and Responsibilities Rasic**

| Description | Responsible 责任人 | Approval 批准 | Support 支持 | Inform 知会 |
|---|---|---|---|---|
| Packaging new Features | SICAR | HAAH | | |
| Styling (Form/surface) New Logo | SICAR | HAAH | | |
| Additional Features HAAH Parts | SICAR | HAAH | | |
| Math DMU (Release) Drawings | SICAR | | | |
| DMU效果图 （释放的） | SICAR | | | |
| Vehicle Technical Specs (New) | SICAR | HAAH | | |
| Define Features List 明确配置表 | HAAH | SICAR | | |
| Component Techincal Spec | SICAR | | | HAAH |
| Master Timing 主时间 | SICAR | HAAH | | |
| Component Timing 配件时间 | SICAR | | | |
| Homologation Testing China | SICAR | | | HAAH |
| Homologation Testing USA | HAAH | SICAR | | |
| Legal Paper Documents & Filing | HAAH | | SICAR | |
| Crash Testing China / USA | SICAR | | HAAH | |
| PWT Calibration USA Sign Off | HAAH | | | |
| PWT Emissions and OBD Certification | HAAH | | | |
| US Ride and Handling +IQS +NVH | HAAH | HAAH | SICAR | |
| US Cold/Hot Start / Altitude | HAAH | HAAH | SICAR | |
| PWT Calibration Adaptation for USA & Canada | | | | |
| Select Supplier | SICAR | | | |
| Supply Vehicles | SICAR | | | |
| Liason with Supplier | HAAH | SICAR | SICAR | |
| Sign-Off meets Legal Requirements | HAAH | SICAR | | |
| Sign-Off Documents | HAAH | SICAR | | |

Schedule 2

ОСТ. 31, 2019

### Schedule 3 - Homologation Requirements

Homologation FMVSS List for Testing & Design per the standards known as of September 2019.

| Regulation/Requirement | Description | |
|---|---|---|
| **Schedule 3** | | |
| FMVSS 101 | Controls and displays | Meet Requirement |
| FMVSS 102 | Transmission shift position sequence, starter interlock, and transmission braking effect. | Meet Requirement |
| FMVSS 103 | Windshield defrosting and defogging systems | Meet Requirement |
| FMVSS 104 | Windshield wiping and washing systems | Meet Requirement |
| FMVSS 106 | Brake hoses | Meet Requirement |
| FMVSS 108 | Lamps, reflective devices, and associated equipment | Meet Requirement |
| FMVSS 110 | Tire selection and rims | Meet Requirement |
| FMVSS 111 | Rear visibility | Meet Requirement |
| FMVSS 113 | Hood latch system | Meet Requirement |
| FMVSS 114 | Theft protection and rollaway prevention | Meet Requirement |
| FMVSS 116 | Motor vehicle brake fluids | Meet Requirement |
| FMVSS 118 | Power operated window, partition and roof panel systems | Meet Requirement |
| FMVSS 124 | Accelerator control systems | Meet Requirement |
| FMVSS 126 | Electronic stability control systems for light vehicles | Meet Requirement |
| FMVSS 135 | Light vehicle brake system | Meet Requirement |
| FMVSS 138 | Tire pressure monitoring systems (TPMS) | Meet Requirement |
| FMVSS 139 | New pneumatic radial tires for light vehicles | Meet Requirement |
| FMVSS 201 | Occupant protection in interior impact | Meet Requirement |
| FMVSS 202a | Head restraints | Meet Requirement |
| FMVSS 203 | Impact protection for the driver from the steering control system | Meet Requirement |
| FMVSS 204 | Steering control rearward displacement | Meet Requirement |
| FMVSS 205 | Glazing materials | Meet Requirement |
| FMVSS 206 | Door locks and door retention components | Meet Requirement |
| FMVSS 207 | Seating systems | Meet Requirement |
| FMVSS 208 | Occupant crash protection | Meet Requirement |
| FMVSS 209 | Seat belt assemblies | Meet Requirement |
| FMVSS 210 | Seat belt assembly anchorages | Meet Requirement |
| FMVSS 212 | Windshield mounting | Meet Requirement |
| FMVSS 213 | Child restraint systems | Meet Requirement |
| FMVSS 214 | Side impact protection | Meet Requirement |
| FMVSS 216a | Roof crush resistance, upgraded standard | Meet Requirement |
| FMVSS 219 | Windshield zone intrusion | Meet Requirement |
| FMVSS 225 | Child restraint anchorage systems | Meet Requirement |
| FMVSS 226 | Ejection mitigation | Meet Requirement |
| FMVSS 301 | Fuel system integrity | Meet Requirement |
| FMVSS 302 | Flammability of interior materials | Meet Requirement |
| FMVSS 401 | Interior Trunk Release (Standard 401) | Meet Requirement |
| Part 523 | Vehicle classification | Meet Requirement |
| Part 541 | Theft prevention standard | Meet Requirement |
| Part 551 | Procedural Rules | Meet Requirement |
| Part 563 | Event Data Recorders (EDR) | Meet Requirement |
| Part 565 | Vehicle Identification Number | Meet Requirement |
| Part 566 | Manufacturer Identification | Meet Requirement |
| Part 567 | Certification | Meet Requirement |
| Part 574 | Tire Identification and recordkeeping | Meet Requirement |
| Part 575 | Consumer Information | Meet Requirement |
| Part 583 | Automobile Parts Content Labeling | Meet Requirement |
| Part 571.10 | Designation of seating positions | Meet Requirement |
| IMDS | International Material Database | Meet Requirement |
| EPA | Exhaust , evaportive, GHG, at sea level and at altitude | Meet Requirement |
| CARB | Exhaust , evaportive, GHG, OBD at sea level | Meet Requirement |
| IIHS | Good Rating | Meet Requirement |
| NCAP | 5 Star Rating | Meet Requirement |
| CMVSS | All Canada CMVSS standards | Meet Requirement |
| Environment and Climate change Canada | Exhaust , evaportive, GHG emissions | Meet Requirement |
| DOT | Parts Registration  (Parts list Provided by HAAH) | Meet Requirement |
| FCC | (FCC) HAAH to provide list. | Meet Requirement |

| Differences from US & Canada Reg | CMVSS 114 - Requires installation of an immobilizer<br>CMVSS 1106 - Noise Emissions<br>The fuel economy label and certification label are different but will be affixed by HAAH. | Information |
|---|---|---|

Schedule 3

OCT. 31, 2019

Schedule 4

Milestones & Payment Plan vs. Deliverables

**M38T 1.6L TGDI Program Timing and Payment Schedule**



**M39T 2.0L TGDI Program Timing and Payment Schedule**



Schedule 4

OCT 31, 2019

Payment Plan vs. Deliverables



| 4th Payment Milestones | |
|---|---|
| 1 | Off-Tool Design Released |
| 2 | Voice of Customer (VoC) quality targets achieved vs. Competitive set. Targets for customer satisfaction - Competitive target Market vehicle identified for each area. |
| 3 | Service BOM completed |
| 4 | Vehicle communications - Frequencies Radio - OBDII - Radar - started |
| 5 | FMVSS/CMVSS 100 series compliance validated Agreed list |
| 6 | FMVSS/CMVSS: 202a,203,204,205,206,207,209,210,212,214 (static) 216,219 and 225 compliance validated Ageed List |
| 7 | Ship M38T vehicles to USA for N. American testing |
| 8 | N. American ride/handling & NVH Initial Calibration completed |
| 9 | N. American first cycle hot/cold altitude - 1 cycle of testing initial calibration completed / Review test reports and make determination of whats needed. |
| 10 | N. American infotainment system - off line systems all infotainment system testing Started |
| 11 | IMDS: populated - Information Listed - PBOM parts are populated into IMDS |
| 12 | D.O.T. registration of applicable suppliers submitted |
| 13 | Carryover component parts identified, and failure rates evaluated - Warranty Costs - Identify which PCMs Lessons learned for warranty cost per vehicle service. Identify c/o bad parts. Track Monthly |
| 14 | Parts marked in accordance with Part 541 requirements (theft prevention standards) - Parts are ready  17 parts to be marked with the VIN. |

| 5th Payment Milestones | |
|---|---|
| 1 | Service special tools developed - Dealership Level - Based on items from today. |
| 2 | Service scan tool codes & manuals released - Based on Current Codes. |
| 3 | SKD plant & dealer diagnostic ,service procedures published In Chinese with English version to follow |
| 4 | SKD/CKD parts assembly process sheets provided in Chinese with English version to follow |
| 5 | Emissions development at sea level & altitude testing - Bosch to deliver calibration ready to start EPA and CARB testing for Certification |
| 6 | OBD systems approval received from CARB - OBD ok to Start testing at CARB |
| 7 | Vehicle compliance reports with FMVSS/CMVSS standards complete with exception of FMVSS 208 |
| 8 | 5 star. NCAP Internal Test Results reported |
| 9 | IIHS internal test results posted and available |
| 10 | Production tooling complete |
| 11 | Radio Frequency Identification (RFID)  tag placement (normally located in lower left hand corner on the windshield - be able to scan the VIN - This is a reminder only, not a deliverable |

Carl I. Biggs

Schedule

OCT. 31, 2019

| Code | Category | Version Name | M38T US Spec Premium | M38T US Spec Premium | M38T US Spec Luxury | M38T US Spec Luxury | | |
|---|---|---|---|---|---|---|---|---|
| | | | **Premium** | **Premium** | **Luxury** | **Luxury** | Bucket 3 | |
| | | SOS Timing | 2019.4 | 2019.4 | 2019.4 | 2019.4 | | |
| | Engine | | 1.6TGDI | 1.6TGDI | 1.6TGDI | 1.6TGDI | | |
| | Transmission | | 7DCT | 7DCT | 7DCT | 7DCT | | |
| | Drivetrain | | FWD | AWD | FWD | AWD | | |
| 01 | **Chassis and steering** | | | | | | | |
| 01 | Chassis and steering | Electric power steering (speed-sensitive) | S | S | S | S | | |
| 01 | Chassis and steering | Manual adjustable steering column - telescopic & tilting | S | S | S | S | | |
| 01 | Chassis and steering | Steering wheel- shift paddles | | | | S | If cost up go back | check wheel config |
| 01 | Chassis and steering | Multi-function steering wheel - Set 1 | | | | | | |
| 01 | Chassis and steering | Multi-function steering wheel - Set 2 | S | S | S | S | | |
| 01 | Chassis and steering | Steering wheel- plastic | | | | | | |
| 01 | Chassis and steering | Steering wheel- leather | S | S | S | S | | |
| 02 | **Wheel and brake** | | | | | | | |
| 02 | Wheel and brake | 4-Wheel Disc Brakes | S | S | S | S | | |
| 02 | Wheel and brake | Ventilated disc brakes of front-wheels | S | S | S | S | | |
| 02 | Wheel and brake | Electronic parking brake (EPB) | S | S | S | S | | |
| 02 | Wheel and brake | 17 inch alloy wheels | | | | | | |
| 02 | Wheel and brake | 18 inch alloy wheels | | | | | | |
| 02 | Wheel and brake | 19 inch alloy wheels - A | S | S | | | | |
| 02 | Wheel and brake | 19 inch alloy wheels - B | | | | | | |
| 02 | Wheel and brake | 19 inch alloy wheels - C | | | | | | |
| 02 | Wheel and brake | Wheel size & Brand | 19" | 19" | 19" | 19" | | |
| 02 | Wheel and brake | Compact spare wheel - steel | S | S | S | S | | |
| 02 | Wheel and brake | Tire repair kit | | | | | | |
| 02 | Wheel and brake | Tools kit | S | S | S | S | | |
| 03 | **Safety feature** | | | | | | | |
| 03 | Safety feature | Front airbags (driver and passenger) | S | S | S | S | | |
| 03 | Safety feature | Front side airbags | S | S | S | S | | |
| 03 | Safety feature | Front & rear side curtain airbags | S | S | S | S | Bucket 1 | |
| 03 | Safety feature | 3-point safety belts at all seating positions | S | S | S | S | | |
| 03 | Safety feature | Head restraints at all seating positions (5) | S | S | S | S | | |
| 03 | Safety feature | Head restraints (4) + Rear center seating with neck support | | | | | | |
| 03 | Safety feature | Front seatbelts reminder | S | S | S | S | | |
| 03 | Safety feature | Rear seatbelts reminder | | | | | | |
| 03 | Safety feature | Front seatbelt pretensioner | S | S | S | S | | |
| 03 | Safety feature | Rear seatbelt pretensioner | | | | | | |
| 03 | Safety feature | ISOFIX | S | S | S | S | | |
| 03 | Safety feature | Tire pressure monitoring system (TPMS) | S | S | S | S | | |
| 03 | Safety feature | LDW - Lane departure warning | S | S | S | S | | |
| 03 | Safety feature | BSW - Blind spot warning | S | S | S | S | | |
| 03 | Safety feature | RCTA - Rear Cross Traffic Alert | S | S | S | S | | |
| 03 | Safety feature | Hill holder | | | | | | |
| 03 | Safety feature | Auto hold | | | | | | |
| 03 | Safety feature | Pre-collision system (FCW+AEB) | S | S | S | S | | |
| 03 | Safety feature | Pre-collision system (FCW+AEB pedestrian recognition) | S | S | S | S | | |
| 03 | Safety feature | Emergency Stop Signal | S | S | S | S | | |
| 04 | **Driving control** | | | | | | | |
| 04 | Driving control | ABS | S | S | S | S | | |
| 04 | Driving control | Electric Brakeforce Distribution (EBD) | S | S | S | S | | |
| 04 | Driving control | Traction Control System (TCS) | S | S | S | S | | |
| 04 | Driving control | Electronic Stability Control (ESC) | S | S | S | S | | |
| 04 | Driving control | Brake Assist System (BAS) | S | S | S | S | | |
| 04 | Driving control | Keyless start | S | S | S | S | | |
| 04 | Driving control | Start-stop system | S | S | S | S | | |
| 04 | Driving control | Selectable Drive Mode (Sport button) | S | S | S | S | | |
| 04 | Driving control | Speed warning | S | S | S | S | | |
| 04 | Driving control | Speed limiter | S | S | S | S | | |
| 04 | Driving control | Cruise control | S | S | S | S | | |
| 05 | Driving control | TJA + ICA | | | | | | |
| 04 | Driving control | Front parking sensors | S | S | S | S | | |
| 04 | Driving control | Rear parking sensors | S | S | S | S | | |
| 04 | Driving control | Rear-view camera | S | S | S | S | | |
| 05 | **Locking and security** | | | | | | | |
| 05 | Locking and security | Outside door handle key cylinders- driver | S | S | S | S | | |
| 05 | Locking and security | Central locking system in vehicle and by key | S | S | S | S | | |
| 05 | Locking and security | Speed sensitive automatic door locking | S | S | S | S | | |
| 05 | Locking and security | Keyless entry | S | S | S | S | | |
| 05 | Locking and security | Immobilizer | S | S | S | S | | |
| 05 | Locking and security | Anti-theft alarm system | S | S | S | S | | |
| 06 | **Exterior feature** | | | | | | | |
| 06 | Exterior feature | Antenna- type- element | S | S | S | S | | |
| 06 | Exterior feature | Fuel flap release | S | S | S | S | | |
| 06 | Exterior feature | Roof rails | S | S | S | S | | |
| 06 | Exterior feature | Towing hook- front and rear | S | S | S | S | | |
| 06 | Exterior feature | Long wheelbase badge | | | | | | |
| 06 | Exterior feature | AWD badge | | S | | S | | |
| 06 | Exterior feature | Integrated dual exhaust pipe (two sides) | S | S | S | S | | |
| 07 | **Interior feature** | | | | | | | |
| 07 | Interior feature | 12v power outlets | S | S | S | S | | |
| 07 | Interior feature | Sunglass holder | S | S | S | S | | |
| 07 | Interior feature | Ashtray | | | | | | |
| 07 | Interior feature | Cigarette lighter | | | | | | |
| 07 | Interior feature | Storage compartment below front passenger's seat | | | | | | |
| 07 | Interior feature | Coat hooks - front head rest | S | S | S | S | | |
| 07 | Interior feature | Coat hooks - rear roof grab handles | S | S | S | S | | |
| 07 | Interior feature | Cup holders- front row | S | S | S | S | | |
| 07 | Interior feature | Cup holders- rear row | S | S | S | S | | |
| 07 | Interior feature | Door pockets/bins- location- front doors | S | S | S | S | | |

Carl C. Riegler

OCT. 31, 2019

48

| # | Category | Feature | | | | | Notes |
|---|---|---|---|---|---|---|---|
| 07 | Interior feature | Door pockets/bins- location- rear doors | S | S | S | S | |
| 07 | Interior feature | Driver's foot rest | S | S | S | S | |
| 07 | Interior feature | Illuminated Door sill - front | | | | | |
| 07 | Interior feature | Door sill - Rear | | | | | |
| 07 | Interior feature | Floor mat - tufted (Luxury) | S | S | S | S | Add Vantas Logo |
| 07 | Interior feature | Center console armrest with storage compartment | S | S | S | S | |
| 07 | Interior feature | Center console adjustable armrest with illuminated storage compartment | | | | | |
| 07 | Interior feature | Passenger assist handles | S | S | S | S | |
| 07 | Interior feature | Flexible cargo divider-high version | | | | | |
| 07 | Interior feature | Flexible cargo divider-low version | | | | | |
| 07 | Interior feature | Retractable cargo cover - manual operation | | | S | S | |
| 07 | Interior feature | Power tailgate | S | S | S | S | |
| 08 | **Seats** | | | | | | |
| 08 | Seats | Height adjustable front headrests | S | S | S | S | |
| 08 | Seats | 6-Way manual adjustable driver's seat (height /forward and backward/seat back | | | | | Check   If cost up for manual we use PWR |
| 08 | Seats | 6-Way power adjustable driver's seat (height /forward and backward/seat back | | | | | Check if Additional Costs |
| 08 | Seats | Driver's seat electrical lumbar support | | | | | |
| 08 | Seats | Front seats heated | | | S | S | |
| 08 | Seats | Driver's seat with memory function | | | S | S | |
| 08 | Seats | Passenger seat forward and backward manual adjustment | S | S | | | |
| 08 | Seats | Passenger seat back tilting manual | S | S | | | If cost up move PWR to Man |
| 08 | Seats | Passenger seat 6-Way power adjustable(height /forward and | | | | | Check if Additional Costs |
| 08 | Seats | Front seats back pockets | S | S | S | S | |
| 08 | Seats | 60/40 split-folding second row seats back | S | S | S | S | |
| 08 | Seats | Height adjustable second row 3 headrests | S | S | S | S | |
| 08 | Seats | Height adjustable second row 2 headrests | | | | | |
| 08 | Seats | Second row seat center armrest | S | S | S | S | |
| 08 | Seats | Seat upholstery- main seat material- cloth | | | | | |
| 08 | Seats | Seat upholstery- main seat material- artificial leather | S | S | | | |
| 08 | Seats | Seat upholstery- main seat material- Pre | | | | | Need Color & Trim Review |
| 08 | Seats | Seat upholstery- main seat material- | | | | | |
| 09 | **Infotainment** | | | | | | |
| 09 | Infotainment | 10.25" 8:3 infotainment display touch screen - Lion System | S | S | S | S | |
| 09 | Infotainment | Telematics- base version (Built-in Apps) | | | | | |
| 09 | Infotainment | Built-in controller low version | | | | | |
| 09 | Infotainment | Built-in controller high version | S | S | S | S | Volume button only   Leave in High |
| 09 | Infotainment | External temperature | S | S | S | S | Not Available for Media/Nav  Cost for upgrade with new button features |
| 09 | Infotainment | Audio system- includes radio- AM/FM | S | S | S | S | |
| 09 | Infotainment | Audio system- speed adjustable | S | S | S | S | |
| 09 | Infotainment | Audio system- Bass treble balance fader | S | S | S | S | |
| 09 | Infotainment | Support multimedia format | S | S | S | S | |
| 09 | Infotainment | Connection to exterior devices including mobile devices | S | S | S | S | |
| 09 | Infotainment | 4 USB ports | S | S | S | S | |
| 09 | Infotainment | Bluetooth connection | S | S | S | S | |
| 09 | Infotainment | 6 speakers | S | S | S | S | |
| 09 | Infotainment | 8 speakers | | | | | Bucket 3   Need Cost Consider Running Change |
| 09 | Infotainment | Arkamys high version | S | S | S | S | |
| 09 | Infotainment | Color TFT display for cluster(7') | | | | | |
| 09 | Infotainment | Full TFT display for cluster(10.25') | | | | | |
| 09 | Infotainment | USB Port for DVR charging | S | S | S | S | |
| 10 | **Lighting** | | | | | | |
| 10 | Lighting | Cluster lighting manual dimming | S | S | S | S | |
| 10 | Lighting | Cluster lighting auto dimming | S | S | S | S | |
| 10 | Lighting | Front reading light | S | S | S | S | |
| 10 | Lighting | Rear reading light | S | S | S | S | |
| 10 | Lighting | Ambience light | S | S | S | S | |
| 10 | Lighting | Gear shifter illumination | S | S | S | S | |
| 10 | Lighting | Cargo area light | S | S | S | S | |
| 10 | Lighting | Glovebox light | S | S | S | S | |
| 10 | Lighting | Full LED headlamp | | S | | S | |
| 10 | Lighting | Daytime running light (LED) | S | S | S | S | |
| 10 | Lighting | Headlamp leveling switch | S | S | S | S | |
| 10 | Lighting | Automatic headlights control | S | S | S | S | |
| 10 | Lighting | Intelligent high-beam control (IHC) | | | | | Check |
| 10 | Lighting | Follow-me-home headlight function | S | S | S | S | |
| 10 | Lighting | Cornering lights | S | S | S | S | |
| 10 | Lighting | Front fog lights | S | S | S | S | |
| 10 | Lighting | Taillight (LED) | S | S | S | S | |
| 10 | Lighting | Center high mount stop light | S | S | S | S | |
| 10 | Lighting | Rear fog lights | S | S | S | S | |
| 10 | Lighting | Reversing lights - Dual | S | S | S | S | |
| 11 | **Glass/ Door mirrors** | | | | | | |
| 11 | Glass/ Door mirrors | Power-adjustable door mirrors | S | S | S | S | |
| 11 | Glass/ Door mirrors | Door mirrors with integral indicator lights | S | S | S | S | |
| 11 | Glass/ Door mirrors | Door mirrors with welcome light (LED light) | S | S | | S | Add Vantas Logo |
| 11 | Glass/ Door mirrors | Heated door mirrors | S | | | S | |
| 11 | Glass/ Door mirrors | Power-folding door mirrors | S | S | S | S | |
| 11 | Glass/ Door mirrors | Boneless windshield wiper | S | S | S | S | N/A |
| 11 | Glass/ Door mirrors | Variable intermittent windshield wipers | S | S | S | S | |
| 11 | Glass/ Door mirrors | Intermittent rain-sensing windshield wipers with adjustable and vehicle-speed-sensitive wiping interval | S | S | S | S | |
| 11 | Glass/ Door mirrors | Rear window- wipers | S | S | S | S | |
| 11 | Glass/ Door mirrors | Inside rear view mirror dimming- manual | S | S | S | S | |

*Rad C. [signature]*   [signatures]   *Davis*

OCT. 31, 2019

49

| | | | | | | | Check Cost | Decision on price |
|---|---|---|---|---|---|---|---|---|
| 11 | Glass/ Door mirrors | Auto-dimming rear-view mirror | | | | | | |
| 11 | Glass/ Door mirrors | Driver and passenger sun visor vanity mirrors illuminated | S | S | S | S | | |
| 11 | Glass/ Door mirrors | Front and rear power windows | S | S | S | S | | |
| 11 | Glass/ Door mirrors | "One-touch" opening and closing of driver door window, anti- pinch | S | S | S | S | | |
| 11 | Glass/ Door mirrors | "One-touch" opening and closing of passenger doors window, anti- pinch | S | S | S | S | | |
| 11 | Glass/ Door mirrors | "One-touch" opening and closing of rear passenger doors window, anti- pinch | S | S | S | S | | |
| 11 | Glass/ Door mirrors | Power windows opening and closing by remote key | S | S | S | S | | |
| 11 | Glass/ Door mirrors | Tinted glass for all window | S | S | S | S | | |
| 11 | Glass/ Door mirrors | Rear window defroster | S | S | S | S | | |
| 11 | Glass/ Door mirrors | Panoramic sunroof | S | S | S | S | | |
| 11 | Glass/ Door mirrors | Privacy glass for rear side and tailgate | S | S | S | S | | |
| 12 | Air conditioning | | | | | | | |
| 12 | Air conditioning | Dual-zone automatic air conditioning | S | S | S | S | | |
| 12 | Air conditioning | CCU segment display rotary button | S | S | S | S | | |
| 12 | Air conditioning | Ventilation system- micro filter | S | S | S | S | | |
| 12 | Air conditioning | Intelligent air purification system (IAPS) - hight level (PM2.5 + AQS) | | | S | S | | |
| 12 | Air conditioning | Air conditioning- rear foot duct | S | S | S | S | | |
| 12 | Air conditioning | Air conditioning- rear outlet mid air | S | S | S | S | | |
| 13 | Others | | | | | | | |
| 13 | Paint | Metallic paint | S | S | S | S | | |

| New Additional Features | | | | |
|---|---|---|---|---|
| Apple CarPlay | S | S | S | S |
| Android Auto | S | S | S | S |
| Towing Capability - Target 2500 - 3500 lbs. | S | S | S | S |
| Heated Windshield | | | S | S |
| Driver/Passenger sun visor extenders | S | S | S | S |
| Satellite Radio - Sirius/XM | S | S | S | S |
| Lion system Upgrade Version | S | S | S | S | TBD Version |

OCT. 31, 2019

| Category | Feature | Premium | Premium | Luxury | Luxury | | |
|---|---|---|---|---|---|---|---|
| | update version (02182019) | | M39T US Spec | | | Bucket 3 | |
| | | | V4.2 (Phase I) | | | | |
| US NCAP | | 5 Star | 5 Star | 5 Star | 5 Star | | |
| **Eninge** | | | | | | | |
| | 2.0 TGDI (140kW) - F4J16 | S | S | S | S | | |
| **Transmission** | | | | | | | |
| | 7DCT | S | S | S | S | | |
| **Drivetrain** | | | | | | | |
| | FWD | S | | S | | | |
| | AWD | | S | | S | | |
| **Chassis and steering** | | | | | | | |
| Chassis and steering | Mcpherson front suspension | S | S | S | S | | |
| Chassis and steering | Multi-link rear suspension | S | S | S | S | | |
| Chassis and steering | Electric power steering (speed-sensitive) | S | S | S | S | | |
| Chassis and steering | Tilt/telescope steering column- Manual adjust | S | S | S | S | | |
| Chassis and steering | Steering wheel- shift paddles | S | S | S | S | | |
| Chassis and steering | Multi-function steering wheel - Set 2 | S | S | S | S | | |
| Chassis and steering | Steering wheel- foamed | Drop | Drop | | | | |
| Chassis and steering | Steering wheel- leather wrapped | S | S | S | S | Need Cost | Consider for Running Change |
| Chassis and steering | Heated Steering wheel | | | | | | |
| Chassis and steering | E-Shift | S | S | S | S | | |
| **Wheel and brake** | | | | | | | |
| Wheel and brake | 4-Wheel Disc Brakes | S | S | S | S | | |
| Wheel and brake | Ventilated disc brakes of front-wheels | S | S | S | S | | |
| Wheel and brake | Electronic parking brake (EPB) | S | S | S | S | | |
| Wheel and brake | 19 inch alloy wheels - A or B | S | S | | | | |
| Wheel and brake | 20 inch alloy wheels | | | S | S | | |
| Wheel and brake | Tire  brand and size | Maxxis 235/55 R19 | Maxxis 235/55 R19 | Continental 235/55 R20 | Continental 235/55 R20 | | |
| Wheel and brake | Compact spare tire (steel) | S | S | S | S | | |
| Wheel and brake | Tools kit | S | S | S | S | | |
| **Safety feature** | | | | | | | |
| Safety feature | Front airbags (driver and passenger) | S | S | S | S | | |
| Safety feature | Front side airbags | S | S | S | S | | |
| Safety feature | Front & rear side curtain airbags | S | S | S | S | | |
| Safety feature | 3-point safety belts at all seating positions | S | S | S | S | | |
| Safety feature | Head restraints at all seating positions | S | S | S | S | | |
| Safety feature | Front seatbelts reminder | S | S | S | S | | |
| Safety feature | Rear seatbelts reminder | S | S | S | S | | |
| Safety feature | Front seatbelt pretensioner | S | S | S | S | | |
| Safety feature | Rear seatbelt pretensioner | S | S | S | S | | |
| Safety feature | Height-adjustable front seatbelt anchors | S | S | S | S | | |
| Safety feature | ISOFIX FMVSS Complient | S | S | S | S | | |
| Safety feature | Tire pressure monitoring system (TPMS) | S | S | S | S | | |

OCT. 31, 2019

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Safety feature | ADAS 2020: | | | | | | |
| Safety feature | - LDW (Lane Departure Warning) | S | S | S | S | | |
| Safety feature | - LKA (Lane Keep Assist) | S | S | S | S | | |
| Safety feature | - BSW (Blind Spot Warning) | S | S | S | S | | |
| Safety feature | - LCA (Lane Change Assist) | S | S | S | S | | |
| Safety feature | - RCTW (Rear Cross Traffic Warning) | S | S | | | | |
| Safety feature | - Pre-collision system (FCW+AEB+PedPro) | S | S | S | S | Need for IIHS | |
| Safety feature | - DOW (Door Open Warning) | S | S | S | S | | |
| Safety feature | - Pre-collision system (FCW+AEB) | | | | | | |
| Safety feature | - DBS (Dynamic Braking System) | S | S | S | S | Check Price DEV | |
| Safety feature | - ACC (Adaptive Cruise Control stop & go) | | | S | S | Must have ACC with AEB Ped | Added Cost |
| Safety feature | - TJA and ICA | | | S | S | Must have ACC with AEB Ped | Added Cost |
| Safety feature | - 360° round view camera (HD AVM) | | | S | S | | |
| Safety feature | - DVR (Digital Video Recorder) | | | S | S | | |
| Safety feature | - Full Auto-parking Assistance (APA) | | | S | S | | |
| Safety feature | - Traffic Sign Recongnition | | | S | S | | |
| Safety feature | Hill holder | S | S | S | S | | |
| Safety feature | Auto hold | S | S | S | S | | |
| Safety feature | Emergency Stop Signal | S | S | S | S | | |
| **Driving control** | | | | | | | |
| Driving control | ABS | S | S | S | S | | |
| Driving control | Electric Brakeforce Distribution (EBD) | S | S | S | S | | |
| Driving control | Traction Control System (TCS) | S | S | S | S | | |
| Driving control | Electronic Stability Control (ESC) | S | S | S | S | | |
| Driving control | Brake Assist System (BAS) | S | S | S | S | | |
| Driving control | Keyless start | S | S | S | S | | |
| Driving control | Start-stop system | S | S | S | S | | |
| Driving control | Selectable Drive Mode (Sport/ECO button) | S | S | S | S | | |
| Driving control | Speed warning | S | S | S | S | | |
| Driving control | Speed limiter | S | S | S | S | | |
| Driving control | Cruise control | S | S | | | | |
| Driving control | Front parking sensors | S | S | S | S | | |
| Driving control | Rear parking sensors | S | S | S | S | | |
| Driving control | Rear-view camera (HD) | S | S | | | | |
| Driving control | Hill descent control | S | S | S | S | | |
| **Locking and security** | | | | | | | |
| Locking and security | Outside door handle key cylinders- driver | S | S | S | S | | |
| Locking and security | Central locking system in vehicle and by key | S | S | S | S | | |
| Locking and security | Speed sensitive automatic door lock | S | S | S | S | | |
| Locking and security | Keyless Go (Keyless entry & Keyless start) | S | S | S | S | | |
| Locking and security | Immobilizer | S | S | S | S | | |
| Locking and security | Anti-theft alarm system | S | S | S | S | Check Spec/DBA | |
| Locking and security | Trunk Easy Open | | | S | S | | |
| **Exterior feature** | | | | | | | |
| Exterior feature | Antenna -type: Shark fin | S | S | S | S | | |
| Exterior feature | Fuel flap release (push-push) | S | S | S | S | Owners Man N/A | |
| Exterior feature | Roof rails | S | S | S | S | | |
| Exterior feature | Towing eyes | S | S | S | S | | |

OCT. 31, 2019

| Exterior feature | Integrated dual exhaust pipe (two sides) | S | S | S | S |
|---|---|---|---|---|---|
| Exterior feature | Body color door handle | S | S | S | S |
| Exterior feature | Chromed Cover door handle | | | | |
| **Interior feature** | | | | | |
| Interior feature | Front 12v power outlets | S | S | S | S |
| Interior feature | Rear 12v power outlets | | | | |
| Interior feature | Sunglass holder | | S | S | S |
| Interior feature | Coat hooks - front head rest | S | S | S | S |
| Interior feature | Coat hooks - rear roof grab handles | S | S | S | S |
| Interior feature | Cup holders- front row | S | S | S | S |
| Interior feature | Cup holders- rear row | S | S | S | S |
| Interior feature | Door pockets/bins- location- front doors | S | S | S | S |
| Interior feature | Door pockets/bins- location- rear doors | S | S | S | S |
| Interior feature | Floor mat - tufted | S | S | S | S |
| Interior feature | Driver's foot rest | S | S | S | S |
| Interior feature | Center console armrest with illuminated storage compartment | S | S | S | S |
| Interior feature | Center console adjustable armrest with illuminated storage compartment | | | | |
| Interior feature | Passenger assist handles | S | S | S | S |
| Interior feature | Power tailgate | | | S | S |
| Interior feature | Chromed door sill (4 doors) | S | S | | |
| Interior feature | Chromed door sill with illumination (4 doors) | | | S | S |
| **Seats** | | | | | |
| Seats | Height adjustable front and 2nd row headrests | S | S | S | S |
| Seats | 8-way power adjust driver seat | | | S | S |
| Seats | 4-way power adjust driver lumbar | S | S | S | S |
| Seats | 6-way power adjust driver | S | S | | |
| Seats | 4-way mannual adjust passenger seat | S | S | | |
| Seats | 6-way power adjust passenger seat | | | S | S |
| Seats | Heated front seats | | | S | S |
| Seats | Front seats ventilation | | | S | S |
| Seats | Driver's seat with memory function | | | S | S |
| Seats | Front seats back pockets | S | S | S | S |
| Seats | 60/40 split-folding second row seats back (2/3; 1/3) | S | S | S | S |
| Seats | Height adjustable 2nd row 3 headrests | S | S | S | S |
| Seats | Height adjustable 3rd row 2 headrests | S | S | S | S |
| Seats | Second row seat center armrest w/ cup holder | S | S | S | S |
| Seats | Second row seat - slidable and reclinable | S | S | S | S |
| Seats | 3rd row seats - reclinable and flat fold | S | S | S | S |
| Seats | Leather trimmed seats (Meridian) | S | S | | |
| Seats | Perforated leather trimmed seats (Turin) | | | S | S |
| Seats | Premium leather trimmed seats (Pre-Nappa) | | | | |
| Seats | Luxury leather trimmed seats (Suede) | | | | |
| **Infotainment** | | | | | |
| Infotainment | 12" infotainment display touch screen | S | S | S | S |
| Infotainment | Touch Pad Controll | S | S | S | S |
| Infotainment | External temperature | S | S | S | S |
| Infotainment | Audio system- includes radio- AM/FM | S | S | S | S |

Add Vantas Logo

Color & Trim Design Review — Send Swatches
Color & Trim Design Review — Send Swatches
Color & Trim Design Review — Send Swatches
Color & Trim Design Review — Send Swatches

Touch

OCT. 31. 2019

53

| | | | | | | |
|---|---|---|---|---|---|---|
| Infotainment | Audio system- speed adjustable | S | S | S | S | |
| Infotainment | Audio system- Bass treble balance fade | S | S | S | S | |
| Infotainment | Navigation system | Drop | Drop | S | S | Offline NAVI - Bucket 3 Need Cost |
| Infotainment | Voice command system | S | S | S | S | Offline voice command Bucket 3 |
| Infotainment | 4G module | S | S | S | S | Suggest Drop,replace bucket3 |
| Infotainment | Built-in Wifi module | S | S | S | S | Suggest Drop,replace bucket3 |
| Infotainment | Support multimedia format (MP3) | S | S | S | S | |
| Infotainment | Font USB ports  (charge & data) (2) | S | S | S | S | |
| Infotainment | 2nd row USB ports  (charge only) (2) | S | S | S | S | |
| Infotainment | 3rd row USB port  (charge only) (1) | S | S | S | S | |
| Infotainment | Bluetooth connection | S | S | S | S | |
| Infotainment | 6 speakers | S | S | | | |
| Infotainment | 8 speakers | | | S | S | |
| Infotainment | 8 branded speakers with amplifier | | | | | |
| Infotainment | Branded speakers | | | | | Bucket 3 Need Cost on Branded Speaker Infinity and JBL |
| Infotainment | Arkamys high version | S | S | S | S | |
| Infotainment | 12" Color TFT display for cluster | S | S | S | S | |
| Infotainment | wireless charge (Front console) | | | S | S | |
| Infotainment | Apple CarPlay system | S | S | S | S | |
| Infotainment | Telematics | S | S | S | S | Bucket 3 |
| Infotainment | Lion AI system | S | S | S | S | Bucket 3 |
| **Lighting** | | | | | | |
| Lighting | Cluster lighting auto dimming | S | S | S | S | |
| Lighting | Cluster lighting manual dimming | S | S | S | S | |
| Lighting | Front reading light | S | S | S | S | |
| Lighting | Rear reading light | S | S | S | S | |
| Lighting | 3rd row reading light | S | S | S | S | |
| Lighting | Ambient interior lighting - Dual color | S | S | | | |
| Lighting | Ambient interior lighting - Multi color | | | S | S | |
| Lighting | Cargo area light | S | S | S | S | |
| Lighting | Glovebox light | S | S | S | S | |
| Lighting | Driver footwell light | S | S | S | S | |
| Lighting | Full LED headlight | S | S | S | S | |
| Lighting | Daytime running light (LED) | S | S | S | S | |
| Lighting | Headlamp auto leveling | S | S | S | S | |
| Lighting | Automatic headlights control | S | S | S | S | |
| Lighting | Follow-me-home headlight function | S | S | S | S | |
| Lighting | Cornering lights | S | S | S | S | |
| Lighting | Front fog lights | S | S | S | S | |
| Lighting | Taillight (LED) | S | S | S | S | |
| Lighting | Center high mount stop light (LED) | S | S | S | S | |
| Lighting | Rear fog lights | S | S | S | S | |
| Lighting | Reversing lights - Dual | S | S | S | S | |
| Lighting | Courtesy lamp on outer mirror (LED) | S | S | S | S | |
| Lighting | Dynamic wiping DI lights | S | S | S | S | Add Logo Bucket 3 |
| **Glass/ Door mirrors** | | | | | | |
| Glass/ Door mirrors | Power-adjustable door mirrors | S | S | S | S | |
| Glass/ Door mirrors | Door mirrors with integral indicator lights | S | S | S | S | |
| Glass/ Door mirrors | Heated door mirrors | S | S | S | S | |

54

| | | | | | | |
|---|---|---|---|---|---|---|
| Glass/ Door mirrors | Power-folding door mirrors | S | S | S | S | |
| Glass/ Door mirrors | Door mirror with blue glass | | | S | S | |
| Glass/ Door mirrors | Door mirrors auto tilt for reversing | | | S | S | |
| Glass/ Door mirrors | Door mirrors with memory function | | | S | S | |
| Glass/ Door mirrors | Variable intermittent windshield wipers | | | | | |
| Glass/ Door mirrors | Intermittent rain-sensing windshield wipers with adjustable and vehicle-speed-sensitive wiping interval | S | S | S | S | |
| Glass/ Door mirrors | Rear window- wipers | S | S | S | S | |
| Glass/ Door mirrors | Inside rearview mirror dimming- manual | | | | | |
| Glass/ Door mirrors | Auto-dimming rear-view mirror Interior | S | S | S | S | |
| Glass/ Door mirrors | Driver and passenger sun visor vanity mirrors illuminated | S | S | S | S | |
| Glass/ Door mirrors | Front and rear power windows | S | S | S | S | |
| Glass/ Door mirrors | "One-touch" opening and closing of driver door window, anti- pinch | S | S | S | S | |
| Glass/ Door mirrors | "One-touch" opening and closing of passenger doors window, anti- pinch | S | S | S | S | |
| Glass/ Door mirrors | "One-touch" opening and closing of rear passenger doors window, anti- pinch | S | S | S | S | |
| Glass/ Door mirrors | Power windows opening and closing by remote key | S | S | S | S | |
| Glass/ Door mirrors | Tinted glass for all window | S | S | S | S | |
| Glass/ Door mirrors | Rear-window defroster | S | S | S | S | |
| Glass/ Door mirrors | Panoramic sunroof | S | S | S | S | |
| Glass/ Door mirrors | Privacy glass for rear side window | S | S | S | S | |
| **Air conditioning** | | | | | | |
| Air conditioning | Three-zone automatic air conditioning | S | S | S | S | |
| Air conditioning | CCU mono TFT screen rotary button | S | S | | | If cost up move back to color |
| Air conditioning | CCU color TFT screen rotary button | | | S | S | |
| Air conditioning | Rear row air condition control | S | S | S | S | |
| Air conditioning | Intelligent air purification system (IAPS) - hight level | S | S | S | S | Check |
| Air conditioning | Air conditioning- rear foot duct | S | S | S | S | |
| Air conditioning | Air conditioning- rear outlet | S | S | S | S | |
| Air conditioning | Air conditioning- 3rd row outlet | S | S | S | S | |
| **Additional features Not on Current Program** | | | | | | |
| | Android Auto and AppleCar Play critical for USA | S | S | S | S | 2 |
| | Sirius/XM Radio | S | S | S | S | 2 |
| | HomeLink Mirror | S | S | S | S | Bucket 3 |
| | Towing capability | S | S | S | S | 2 |
| | HD Radio | S | S | S | S | Bucket 2 |
| | Sun Visor Extender | S | S | S | S | Add Bucket 3 |

# EXHIBIT 3

# SUPPLEMENTAL AGREEMENT TO ENGINEERING SERVICES AGREEMENT

dated

2019

by

## HAAH MOTORS HOLDINGS, INC.
HAAH

and

## SHANGHAI SICAR AUTOMOBILE TECHNOLOGY DEVELOPMENT CO., LTD.
Sicar

**Supplemental Agreement to Engineering Services Agreement**

**This Agreement** is dated _____/__/___    2019

**Between**

**HAAH Motors Holdings, Inc.**, a corporation duly organized and existing under the laws of the State of Delaware whose principal place of business is at 29 Parker, Irvine, CA 92618 USA ("**HAAH**"); and

**Shanghai Sicar Automobile Technology Development Co., Ltd.**, a corporation duly organized and existing under the laws of the People's Republic of China whose principal place of business is First Floor, Block One, 251 Yaohua Road, China (Shanghai) Pilot Free Trade Zone, P.R. China ("**Sicar**").

**Sicar** and **HAAH** are hereinafter jointly referred to as the "**Parties**" and individually as a "**Party**".

**Recitals**

A.    The Parties entered into an Engineering Services Agreement dated 12 October 2019 ("**Original Agreement**") pursuant to which the Parties agreed to cooperate to modify certain Exeed vehicle models for the purposes of marketability and meeting homologation requirements in the United States of America and Canada.

B.    The Parties have agreed to amend the Original Agreement on the terms set out in this Supplemental Agreement.

**1.    Definitions and Interpretation**

1.1    Unless otherwise specified, words and expressions defined in the Original Agreement and not otherwise defined or amended in this Supplemental Agreement shall have the same meanings when used in this Supplemental Agreement.

1.2    Unless otherwise specified, the principles of interpretation in Section 1.34 of the Original Agreement shall also apply to this Supplemental Agreement.

**2.    Amendments to the Original Agreement**

2.1    In the paragraphs A and B of the preambles of the Original Agreement, the word "Exeed" shall be deleted.

2.2    The definition of "Exeed Vehicles" in Section 1.15 of the Original Agreement shall be replaced with the following:

""*Exeed Vehicles*" *means the vehicle models set out in Schedule 1, which may be supplemented or modified from time to time by the Parties in writing.*"

2.3    Schedule 1 of the Original Agreement shall be amended by deleting the words "*M31T or M32T to be selected by the mutual agreement by the Parties.*"

2.4    The "M31T/M32T" column heading in the table of Schedule 1 of the Original Agreement shall be deleted and replaced by "M38T".

2.5    The "M36T" column heading in the table of Schedule 1 of the Original Agreement shall be deleted and replaced by "M39T".

2.6    Section 2.1 of the Original Agreement shall be amended by inserting the following wording at the end of Section 2.1:

    "*For the avoidance of doubt, the Engineering Services do not include the "Bucket 3" items set out in Schedule 2, and any services relating to such items shall be agreed and documented separately by the Parties.*"

2.7    Schedule 3 of the Original Agreement shall be deleted and replaced in its entirety by the Schedule 3 attached hereto in Exhibit 1.

**3.    Agreed Form of Schedule 2 and 4 of the Original Agreement**

The Parties acknowledge that, in accordance with Section 2.2 of the Original Agreement, the Parties have agreed on the contents of Schedule 2 and Schedule 4 of the Original Agreement and initialled the same, as set out in Exhibit 1, within the time limits specified in Section 2.2 of the Original Agreement. As a result, Schedule 2 and Schedule 4 as attached hereto in Exhibit 1 are incorporated into the Original Agreement pursuant to Section 2.2 of the Original Agreement.

**4.    Effectiveness of the Amendments**

4.1    The amendments provided for in this Supplemental Agreement shall take effect immediately upon execution of this Supplemental Agreement.

4.2    With effect from the execution of this Supplemental Agreement:

    (a)    the Original Agreement and this Supplemental Agreement shall together be read and construed as one document, and references in the Original Agreement to "this Agreement" shall mean the Original Agreement as amended by this Supplemental Agreement ("**Amended Agreement**"); and

    (b)    the rights and obligations of the Parties shall be governed by the Amended Agreement.

**5.    Governing Law and Dispute Resolution**

The provisions of Sections 22 and 23 of the Original Agreement shall be incorporated into this Supplemental Agreement and shall have full force and effect as if set out in full in this Supplemental Agreement except that references in those clauses to "this Agreement" shall become references to this Supplemental Agreement.

**6.    Counterparts**

This Supplemental Agreement may be executed in counterparts, each of which is deemed an original, but all of which together are deemed to be one and the same instrument.

*[The remainder of this page is intentionally left blank.]*

2

**Execution**

**IN WITNESS** whereof this Supplemental Agreement has been executed by the Parties on the date first above written.

**HAAH Motors Holdings, Inc.**

Name: Duke Hale

Title: Chairman & CEO

**Shanghai Sicar Automobile Technology Development Co., Ltd.**

Name: Zhang Guibing

Title: Authorized Representative

3

# EXHIBIT 4

Second Supplemental Agreement to Engineering Services Agreement

This Second Supplemental Agreement to Engineering Services Agreement (this "Supplemental Agreement") is dated 14 July 2020

Between

**HAAH Motors Holdings, Inc.,** a corporation duly organized and existing under the laws of the State of Delaware whose principal place of business is at 29 Parker, Irvine, CA 92618 USA ("**HAAH**"); and

**Shanghai Sicar Automobile Technology Development Co., Ltd.,** a corporation duly organized and existing under the laws of the People's Republic of China whose principal place of business is First Floor, Block One, 251 Yaohua Road, China (Shanghai) Pilot Free Trade Zone, P.R. China ("**Sicar**").

Sicar and HAAH are hereinafter jointly referred to as the "**Parties**" and individually as a "**Party**".

Recitals

A.    The Parties entered into an Engineering Services Agreement dated 12 October 2019 and a Supplemental Agreement to Engineering Services Agreement dated 13 January 2020 (together, the "**Original Agreement**") pursuant to which the Parties agreed to cooperate to modify certain Exeed vehicle models for the purposes of marketability and meeting homologation requirements in the United States of America and Canada.

B.    The Parties have agreed to amend and supplement the Original Agreement on the terms set out in this Supplemental Agreement.

1.    **Definitions and Interpretation**

1.1    Unless otherwise specified, words and expressions defined in the Original Agreement and not otherwise defined or amended in this Supplemental Agreement shall have the same meanings when used in this Supplemental Agreement.

1.2    Unless otherwise specified, the principles of interpretation in Section 1.34 of the Original Agreement shall also apply to this Supplemental Agreement.

2.    **Supplements and Amendments to the Original Agreement**

2.1    The Parties acknowledge and agree that, under the Original Agreement, HAAH is responsible at its cost for, among other things, the following in relation to undertaking homologation procedures and obtaining homologation approvals or certificates for Exeed Vehicles: Homologation Testing USA, Legal Paper Documents & Filings (which includes registering Exeed Vehicles with EPA, CARB and OBD and VIN registration), PWT Calibration USA Sign Off, PWT Emissions and OBD Certification, US Ride and Handling +IQS +NVH, US Cold/Hot Start/Altitude, and, with respect to PWT Calibration Adaptation for USA & Canada, Liaison with Supplier, Sign-Off Meets Legal Requirements, Sign-Off Document.

2.2    Pursuant to HAAH's request and subject to Section 2.3, Sicar agrees to refund US$750,000 of the Engineering Services Fees paid by HAAH to Sicar to date in order for HAAH to fund the expenses attached in Exhibit 1 to this Supplemental Agreement, which HAAH will incur for purposes of US Ride and Handling +IQS +NVH, US Cold/Hot Start/Altitude.

2.3    HAAH shall pay the US$750,000 back to Sicar before 31 December 2020.

2.4    HAAH acknowledges and agrees that Sicar shall not be deemed to be in breach of the Original Agreement in relation to any delay in performing the Engineering Services in accordance with the schedule contemplated by the Original Agreement. The Parties will

1779866-v1\BEIDMS

further discuss and agree on relevant changes to the schedule for the provision of Engineering Services.

**3.      Effectiveness of the Amendments**

3.1     The amendments and supplemental provisions provided for in this Supplemental Agreement shall take effect immediately upon execution of this Supplemental Agreement.

3.2     With effect from the execution of this Supplemental Agreement:

(a)     the Original Agreement and this Supplemental Agreement shall together be read and construed as one document, and references in the Original Agreement to "this Agreement" shall mean the Original Agreement as amended by this Supplemental Agreement ("**Amended Agreement**"); and

(b)     the rights and obligations of the Parties shall be governed by the Amended Agreement.

3.3     Except as expressly amended by this Supplemental Agreement, the provisions of the Original Agreement shall continue in full force and effect in accordance with their terms.

**4.      Governing Law and Dispute Resolution**

The provisions of Sections 22 and 23 of the Original Agreement shall be incorporated into this Supplemental Agreement and shall have full force and effect as if set out in full in this Supplemental Agreement except that references in those clauses to "this Agreement" shall become references to this Supplemental Agreement.

**5.      Counterparts**

This Supplemental Agreement may be executed in counterparts, each of which is deemed an original, but all of which together are deemed to be one and the same instrument.

*[The remainder of this page is intentionally left blank.]*

1779866-v1\BEIDMS

**Execution**

**IN WITNESS** whereof this Supplemental Agreement has been executed by the Parties on the date first above written.

**HAAH Motors Holdings, Inc.**

Name: Jeffrey H. Coats

Title: Executive Vice President, Finance

**Shanghai Sicar Automobile Technology Development Co., Ltd.**

Name: Zhang Guibing

Title: Authorized Representative

1779866-v1\BEIDMS

*Exhibit 1*
**HAAH Expenses for US Ride and Handling +IQS +NVH, US Cold/Hot Start/Altitude**

## Test Activities for North America Testing

### Hot Climate Testing

Instrumentation Equipment Accelerometer,Campbellscientific data logger?,Measuring tape,vibrometer,sound level meter,uv light meter Data Acquisition - at least 4 vehicles

Communication equipment — walkie talkies

3 benchmark vehicles for 14 days

Accommodation x 14 nights
Fuel — 2,800 miles for 6 cars
Labour x 5 people
Travel expenses x 8 people x 14 nights
Report writing
Contingency

### Vehicle Dynamics

Test Facility - Initial 4-post profile (4 phases of heave, pitch, roll, warp - and frequency sweeps)

Purchase image vehicle — Mazda Cx5
2 benchmark vehicles (Pallisade & Sante Fe) for 10 days
Accommodation x 15 nights
Fuel — 5,000 miles for 4 cars
Labour x 4 people
Travel expenses x 4 people x 10 nights
Vehicle Shipping
Facilities — Final 4-post and K&C rig
Report writing
Contingency

### Cold Climate Testing

Accelerometer,Campbellscientific data logger?,Measuring tape,vibrometer,sound level meter, Data Acquisition cost - at least 4 vehicles

3 benchmark vehicles for 14 days

Accommodation x 14 nights
Fuel — 4,500 miles for 8 cars
Travel expenses x 8 people x 14 nights
Report writing
Contingency

# EXHIBIT 5

Confidential 高密

**Third Supplemental Agreement to Engineering Services Agreement**

**This Third Supplemental Agreement to Engineering Services Agreement** (this "**Supplemental Agreement**") is dated 18 August 2020

**Between**

**HAAH Motors Holdings, Inc.**, a corporation duly organized and existing under the laws of the State of Delaware whose principal place of business is at 29 Parker, Irvine, CA 92618 USA ("**HAAH**"); and

**Shanghai Sicar Automobile Technology Development Co., Ltd.**, a corporation duly organized and existing under the laws of the People's Republic of China whose principal place of business is First Floor, Block One, 251 Yaohua Road, China (Shanghai) Pilot Free Trade Zone, P.R. China ("**Sicar**").

**Sicar** and **HAAH** are hereinafter jointly referred to as the "**Parties**" and individually as a "**Party**".

**Recitals**

A.    The Parties entered into an Engineering Services Agreement dated 12 October 2019 and a Supplemental Agreement to Engineering Services Agreement dated 13 January 2020 (together, the "**Original Agreement**") pursuant to which the Parties agreed to cooperate to modify certain Exeed vehicle models for the purposes of marketability and meeting homologation requirements in the United States of America and Canada.

B.    The Parties entered in to a Second Supplemental Agreement to Engineering Services Agreement dated 14 July 2020 (the "**Second Supplemental Agreement**") pursuant to which Sicar agrees to refund seven hundred and fifty thousand US dollars to HAAH and HAAH agrees to pay the same back by 31 December 2020.

C.    The Parties have agreed to amend and supplement the Original Agreement and the Second Supplemental Agreement on the terms set out in this Supplemental Agreement.

**1.      Definitions and Interpretation**

1.1    Unless otherwise specified, words and expressions defined in the Original Agreement and not otherwise defined or amended in this Supplemental Agreement shall have the same meanings when used in this Supplemental Agreement.

1.2    Unless otherwise specified, the principles of interpretation in Section 1.34 of the Original Agreement shall also apply to this Supplemental Agreement.

**2.      Supplements and Amendments to the Original Agreement and Second Supplemental Agreement**

The Parties agree to terminate the Second Supplemental Agreement.

**3.      Effectiveness of the Amendments**

3.1    The amendments and supplemental provisions provided for in this Supplemental Agreement shall take effect immediately upon execution of this Supplemental Agreement.

3.2    With effect from the execution of this Supplemental Agreement:

(a)    the Original Agreement, the Second Supplemental Agreement and this Supplemental Agreement shall together be read and construed as one document, and references in the Original Agreement to "this Agreement" shall mean the Original Agreement as amended by this Supplemental Agreement ("**Amended Agreement**"); and

Confidential 商密

(b)    the rights and obligations of the Parties shall be governed by the Amended
Agreement.

3.3    Except as expressly amended by this Supplemental Agreement, the provisions of the Original
Agreement and the Second Supplemental Agreement shall continue in full force and effect in
accordance with their terms.

**4.    Governing Law and Dispute Resolution**

The provisions of Sections 22 and 23 of the Original Agreement shall be incorporated into
this Supplemental Agreement and shall have full force and effect as if set out in full in this
Supplemental Agreement except that references in those clauses to "this Agreement" shall
become references to this Supplemental Agreement.

**5.    Counterparts**

This Supplemental Agreement may be executed in counterparts, each of which is deemed an
original, but all of which together are deemed to be one and the same instrument.

*[The remainder of this page is intentionally left blank.]*

2

Confidential 高密

**Execution**

**IN WITNESS** whereof this Supplemental Agreement has been executed by the Parties on the date
first above written.

**HAAH Motors Holdings, Inc.**

Name: Duke Hale

Title: Chairman & CEO


**Shanghai Sicar Automobile Technology Development Co., Ltd.**


Name:

Title:

3

# EXHIBIT 6

Confidential 商密

**Fourth Supplemental Agreement to Engineering Services Agreement**

This **Fourth Supplemental Agreement to Engineering Services Agreement** (this "**Supplemental Agreement**") is dated 18 August 2020

**Between**

**HAAH Motors Holdings, Inc.**, a corporation duly organized and existing under the laws of the State of Delaware whose principal place of business is at 29 Parker, Irvine, CA 92618 USA ("**HAAH**"); and

**Shanghai Sicar Automobile Technology Development Co., Ltd.**, a corporation duly organized and existing under the laws of the People's Republic of China whose principal place of business is First Floor, Block One, 251 Yaohua Road, China (Shanghai) Pilot Free Trade Zone, P.R. China ("**Sicar**").

**Sicar** and **HAAH** are hereinafter jointly referred to as the "**Parties**" and individually as a "**Party**".

**Recitals**

A.   The Parties entered into an Engineering Services Agreement ("ESA") dated 12 October 2019 and a Supplemental Agreement to ESA dated 13 January 2020 pursuant to which the Parties agreed to cooperate to modify certain Exeed vehicle models for the purposes of marketability and meeting homologation requirements in the United States of America and Canada.

B.   The Parties entered in to a Second Supplemental Agreement to ESA dated 14 July 2020, and a Third Supplemental Agreement to ESA dated 18 August 2020 pursuant to which the Parties agreed to terminate the Second Supplemental Agreement to ESA (all agreements above in Paragraph A and B of this Recital together the "**Original Agreement**").

C.   To meet the practical needs of the engineering services, the Parties have agreed to amend and supplement the Original Agreement on the terms set out in this Supplemental Agreement.

**1.**   **Definitions and Interpretation**

1.1   Unless otherwise specified, words and expressions defined in the Original Agreement and not otherwise defined or amended in this Supplemental Agreement shall have the same meanings when used in this Supplemental Agreement.

1.2   Unless otherwise specified, the principles of interpretation in Section 1.34 of the Original Agreement shall also apply to this Supplemental Agreement.

**2.**   **Supplements and Amendments to the Original Agreement ~~and Second~~ Supplemental Agreement**

*第 1 7,000,000 元*

2.1   Sicar has received a total amount of US$~~1,700,000~~ dollars plus RMB¥5,000,000 yuan (which amounts to US$ 704, 225.35 with then USD to CNY rate at 7.1 yuans per dollar at the time of payment) of Engineering Services Fees paid by HAAH so far to this date under the Original Agreement. To meet the practical needs of the engineering services, the Parties agree to amend the payment schedule under Section 3.2 of the Engineering Services Agreement to the extent that an amount of US$750,000 dollars out of the total amount of Engineering Services Fees HAAH paid so far to this date is rescheduled to 31 December 2020. For this purpose, Sicar is to refund such amount of US$750,000 dollars to HAAH.

2.2   HAAH acknowledges and agrees that Sicar shall not be deemed to be in breach of the Original Agreement in relation to any delay in performing the Engineering Services in accordance with the schedule contemplated by the Original Agreement. The Parties will

1

Confidential 商密

further discuss and agree on relevant changes to the schedule for the provision of Engineering Services.

**3.     Effectiveness of the Amendments**

3.1     The amendments and supplemental provisions provided for in this Supplemental Agreement shall take effect immediately upon execution of this Supplemental Agreement.

3.2     With effect from the execution of this Supplemental Agreement:

(a)     the Original Agreement and this Supplemental Agreement shall together be read and construed as one document, and references in the Original Agreement to "this Agreement" shall mean the Original Agreement as amended by this Supplemental Agreement ("**Amended Agreement**"); and

(b)     the rights and obligations of the Parties shall be governed by the Amended Agreement.

3.3     Except as expressly amended by this Supplemental Agreement, the provisions of the Original Agreement shall continue in full force and effect in accordance with their terms.

**4.     Governing Law and Dispute Resolution**

The provisions of Sections 22 and 23 of the Original Agreement shall be incorporated into this Supplemental Agreement and shall have full force and effect as if set out in full in this Supplemental Agreement except that references in those clauses to "this Agreement" shall become references to this Supplemental Agreement.

**5.     Counterparts**

This Supplemental Agreement may be executed in counterparts, each of which is deemed an original, but all of which together are deemed to be one and the same instrument.

*[The remainder of this page is intentionally left blank.]*

2

Confidential 高密

**Execution**

**IN WITNESS** whereof this Supplemental Agreement has been executed by the Parties on the date first above written.

**HAAH Motors Holdings, Inc.**

Name: Duke Hale

Title: Chairman & CEO


**Shanghai Sicar Automobile Technology Development Co., Ltd.**


Name:

Title:

5